ORIGINAL

Deborah Cooney, Plaintiff, In Propria Persona
P. O. Box 700013
Wabasso, FL 32970
858-380-6594
celestecan@hotmail.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

CV 18 1860

FILED
2018 MAR 26 P 4: 14

DEBORAH COONEY,

    Plaintiff,

vs.

THE CITY OF SAN DIEGO; THE
COUNTY OF SAN DIEGO; JOHN KERR;
IVAN BAROYA; DOMINICK ADDARIO;
THOMAS J. MASSEY; TANI CANTIL-
SAKAUYE; JUDITH MCCONNELL;
PATRICIA D. BENKE; JUDITH L.
HALLER; JOAN IRION; ALEX C.
MCDONALD; JAMES A. MCINTYRE;
GILBERT NARES; CYNTHIA AARON;
RICHARD D. HUFFMAN; TERRY B.
O'ROURKE; YURI HOFMANN; ROBERT
C. TRENTACOSTA; BONNY HSU; KEITH
PHILLIPS; GEORGE W. BREWSTER, JR.;
WILLIAM P. FLYNN; CHRISTOPHER J.
SKORINA; JAN I. GOLDSMITH; JOHN
RILEY; THOMAS MONTGOMERY;
CHRISTINA VILASECA; MATHEW
SOUTHER; NEIL, DYMOTT, FRANK,
MCFALL & TREXLER; MICHAEL
PICKER, PRESIDENT, CALIFORNIA
PUBLIC UTILITIES COMMISSION
(CPUC); MICHAEL R. PEEVEY; KAMALA
D. HARRIS; XAVIER BECERRA,
CALIFORNIA ATTORNEY GENERAL;
SAN DIEGO GAS & ELECTRIC (SDG&E);
ITRON, INC.; EDMUND G. BROWN,
CALIFORNIA GOVERNOR; RICK SCOTT,
FLORIDA GOVERNOR; THE CITY OF
WHITE SULPHUR SPRINGS; CITY OF
VERO BEACH; INDIAN RIVER COUNTY;
FLORIDA POWER & LIGHT (FPL);
MONPOWER; AT&T CORP.; LEWIS,
BRISBOIS, BISGAARD & SMITH, LLP;
VOCELLE & BERG, LLP; DEAN,

**VERIFIED COMPLAINT**

**DEMAND FOR JURY TRIAL**

VERIFIED COMPLAINT

1

RINGERS, MORGAN & LAWTON, P.A.;
DIAMOND LITTY; KIERNAN MOYLAN;
DOROTHY NAUMANN; LYDIA
PITTAWAY; BRUCE H. COLTON; BRIAN
WORKMAN; DAVID DODD; ELISE
BRAWNER; JEFFREY R. SMITH, CLERK
OF COURT; MICHAEL RODDY, COURT
EXECUTIVE OFFICER; HENRY COKER;
RANDY MIZE; BONNIE DUMANIS;
SUMMER STEPHAN, SAN DIEGO
DISTRICT ATTORNEY; STAN IDEKER;
FARMERS INSURANCE; STEWART
TITLE INSURANCE; AMERICAN
STRATEGIC INSURANCE (ASI); NEW
HAMPSHIRE INSURANCE COMPANY;
SEACOAST BANK; WHOLE FOODS;
WALMART, INC.; CUMBERLAND
FARMS; KEITH H. RUTMAN; BRYAN W.
PEASE; NICHOLAS J. LEWIS; JOHN
SERRANO; STEPHEN I. OSTROW;
TENANTS LEGAL CENTER; RICHARD
M. BENRUBI; ROONEY & ROONEY, P.A.;
EARL K. MALLORY; ANDREW B.
METCALF; THOMAS A. KENNEDY;
KEVIN M. ROLLIN; WILLIAM TERRY;
JUSTIN CLARK; CITY OF SEBASTIAN;
TOWN OF INDIAN RIVER SHORES;
SOUTH FLORIDA EVALUATION AND
TREATMENT CENTER (SFETC); MIKE
CARROLL, SECRETARY, DEPARTMENT
OF CHILDREN AND FAMILIES (DCF);
CORRECT CARE SOLUTIONS, LLC.;
CORE CIVIC, INC.
AND DOES 1-100, INCLUSIVE;

Defendants.

Comes now the "Plaintiff", Deborah Cooney, in propria persona, to allege and verify the following "Complaint":

## I. INTRODUCTION

1. Pursuant to 42 U.S.C. §1983, Plaintiff seeks declaratory and injunctive relief as well as compensatory damages for the criminal conduct of the Defendants. Many of the Defendants were parties in previous actions (Underlying Cases) in which they committed intrinsic and extrinsic fraud on the courts. The remaining Defendants assisted in committing the fraud on the

courts, although they had not been named as parties to the original actions. All of the Underlying Cases were brought pursuant to 42 U.S.C. §1983 and other legal theories. This action incorporates the violation of federal rights which resulted in fraud on the court, as well as the transgressions enumerated in the Underlying Cases.

2. "The requisite fraud on the court occurs where "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989).

## II. JURISDICTION

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Plaintiff's claims arise under the laws of the United States.

4. This Court has original jurisdiction over the civil rights claims in this action pursuant to 28 U.S.C. §1343(a).

5. This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367(a).

6. The declaratory and injunctive relief requested is authorized by 28 U.S.C. §§2201 and 2202.

## III. VENUE

7. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(b)(1) because several of the Defendants reside in Northern California.

8. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in Northern California. Two of the four Underlying Cases were brought in this Court.

## IV. STATEMENT OF THE CASE

9. The Plaintiff filed four federal 42 U.S.C. §1983 actions and followed all procedural guidelines set forth by law in all four of the Underlying Cases styled Cooney v. San Diego, et al, 3:2013cv00677 and 3:2013cv01373; Cooney v. CPUC et al, 4:2012cv06466; Cooney v. White Sulphur Springs et al, 5:2013cv10377; and Cooney v. Vero Beach et al, 2:2015cv14284.

10. Defendants committed intrinsic and/or extrinsic fraud on the court in all of the Underlying Cases and other related state court cases as well.

11. Plaintiff was legally entitled to the relief that she sought in all four of the Underlying Cases and all of the other cases that she has filed in various courts of law. In fact, Plaintiff would never file an action in which she was not entitled to relief. Plaintiff is an ethical person.

12. In Cooney v. San Diego, Plaintiff had a right to a jury trial to decide the facts of an underlying case in state court. Justices of the California Court of Appeals made up their own set of facts, which differed from the facts submitted by the parties. Again, the state court defendants committed fraud on the state court.

13. In Cooney v. CPUC, Plaintiff had a constitutional right to be free from harmful radio emissions in her own home.

14. In Cooney v. White Sulphur Springs, Plaintiff was falsely arrested for making a U-turn, after she had signed a notice to appear and made the required appearance. Furthermore, the U-turn

was perfectly legal and the bogus citation was dismissed. Plaintiff was arrested without probable cause.

15. In Cooney v. Vero Beach, Plaintiff was falsely arrested while exercising her constitutional right to visit the public library. The U.S. Supreme Court has declared that "presence in the library was unquestionably lawful. It was a public facility, open to the public." Brown v. Louisiana, 383 U.S. 131, 139 (1966).

16. Many of the Defendants are or were public entities, public employees, public contractors, or officers of the court. Some of the Defendants hold or held state licenses to practice their professions. The remaining Defendants aided and abetted the state actors in perpetrating fraud on the courts.

17. The following sections of the California Government Code establish liability to the Plaintiff:
815.2(a) A public entity is vicariously liable for the negligence of an employee.
815.6 A public entity is liable for its failure to discharge a mandatory duty to protect.
820(a) A public employee is liable for injury caused by his act or omission.
820.8 Nothing exonerates a public employee from liability for injury caused by his own negligence.
11120 The people retain sovereignty over the State agencies which serve them.

18. The following sections of the California Civil Code further establish the Defendants' liability:
43 Right of protection from bodily restraint or harm.
1708 All persons must abstain from injuring the person or property of another or infringing upon the rights of another.
1709 One who willfully deceives another is liable for damages.

1710 Deceit is defined as an untrue assertion, suppression of a fact so as to mislead, or a false promise.

1714(a) Liability for injury arises from want of ordinary care or skill.

19. The laws of Florida, West Virginia, and other states have similar provisions.

20. Some of the Defendants' own websites advertise their duty to protect the public welfare. Any denial of this duty could be construed as false advertising. It also begs the question: What purpose do the Defendants serve if not to ensure the public justice, health, and safety? Why should we continue to fund the Defendants with our tax dollars while they continue to shirk their duties?

21. This case raises significant issues of federal law which are beyond the scope of the state courts, including:

U.S. Constitution, Amendments I, IV, V, VI, VII, VIII, IX, X and IVX, Right to free exercise of religion and freedom of speech, Right to petition the government for redress of grievances, Right of the people to be secure in persons and houses, Right to life, liberty, and property, Right to due process of law, Right to counsel, Right to a speedy trial, Right to a civil jury trial, Right to be free from excessive restraint or punishment, Rights retained by the people, Right to privacy, States shall not deprive citizens of privileges, life, liberty or property, due process of law, and/or equal protection of the laws.

18 U.S.C. ss. 241-2 Criminal Code, Chapter 13, Civil Rights, Conspiracy against rights, Deprivation of rights under color of law

42 U.S.C. ss. 1983, 1985 and 1986 Public Health and Welfare Code, Chapter 21 Civil Rights, Civil action for deprivation of rights, Conspiracy to interfere with civil rights, Action for neglect to prevent

# V. STATEMENT OF FACTS

## A. PRECIPATORY ACTS OR OMISSIONS GIVING RISE TO CLAIM

22. Plaintiff wrote the following letter to the FBI stating the facts of the Defendants' criminal activities:

> Deborah Cooney
> P O Box 700013
> Wabasso, FL 32970
> celestecan@hotmail.com

March 19, 2018

Federal Bureau of Investigation
450 Golden Gate Ave
San Francisco, CA 94102

To the Bureau:

23. I am writing to report an incident of trespass, theft, burglary, and vandalism. Although these crimes are ordinarily state crimes, the participation of state actors, including sheriffs, police, judges, public attorneys, and others, in perpetrating the crimes, bring them into the purview of federal authorities pursuant to 18 U.S.C. § 242. Moreover, there is evidence of additional violations of federal law related to the incident. There is evidence of narcotics trafficking, racketeering, bribery, extortion, tampering with U.S. mail, and fraud on both federal and state courts. There is evidence of curtailment of federal rights such as due process, equal protection, free exercise of religion, free speech, freedom from excessive restraint and punishment (torture),

counsel, speedy trial, bail, life, liberty, and property. A wrongful extradition, which was not authorized by 18 U.S.C. § 3182, was carried out. Finally, the facts of the case cross state and international borders, from Mexico to California to Florida to the District of Columbia to New Jersey.

24. This is not the first time that these crimes have been reported. The FBI and other agencies should already have a file concerning these activities. I reported the state crimes to state and local authorities at the time of the incident. They responded by harassing me, threatening me, and writing false reports. I reported the 2008 San Diego sexual harassment incident to the Department of Justice (DOJ) and the state attorney general. They refused to help. I have reported the narcotics crimes to the Drug Enforcement Agency (DEA) in various cities on various occasions. The DEA was unresponsive. I have filed pleadings in state and federal courts of law, all to no avail. The courts denied justice. Other citizens have witnessed and reported similar crimes committed by the same perpetrators. These other citizens experienced a similar lack of enforcement, followed by similar retaliation and denial of justice.

25. I respectfully request that the FBI investigate these matters, arrest the perpetrators, and refer the case to the DOJ for prosecution. The FBI has a duty to do so. I further request special protection and perhaps admission into a witness protection program. My personal safety and security have been compromised. I have received credible death threats. There have been several attempts to kill or injure me. I was beaten and forcibly drugged. Three people connected to the case have recently died under suspicious circumstances: John Tallent (JT), my common law husband; Susan Semmel, my attorney; and Michael Hnatusko, one of the perpetrators. My property is under attack. I have been denied police protection. I have been denied legal counsel. I am a whistleblower who has experienced systematic retaliation rising to the level of organized crime, which is prohibited by the RICO Act. For these reasons, I am a candidate for special protection.

26. I have witnessed similar crimes carried out against others. In Green Bank, WV, in 2012, I met a very bright paralegal, Sandy Aders. We had something in common. We had both reported the misconduct of California state judges. We both fled to the radiation-free zone in Green Bank because of radiation injuries. Both of our homes were under constant attack, regardless of where they were located (CA, WV, ID, FL). Both of our personal relationships were under attack, through gaslighting, threats, or hardship. Sandy's husband left her on the same day in August 2012 that my WV friend threw a bucket of paint at me. By 2016, my family was being gaslighted into believing that I had a mental illness, although multiple mental examinations have proven that I am in mentally healthy. Previous efforts to gaslight me had failed.

In October 2016, I witnessed at least one wrongful extradition taking place at the same time as mine. An AL man was charged with bouncing a check in AL while on a two-week business trip to Las Vegas. Instead of waiting two weeks for him to return home, they spent a month incarcerating and extraditing him. He was injured during the extradition, his ankles raw and bleeding from improper shackling. He was feverish and vomiting. Core Civic profited from this abuse.

27. At South Florida Evaluation and Treatment Center (SFETC), I witnessed systematic abuse under the authority of FL Department of Children and Families (DCF). Numerous people were improperly placed in the facility. The improper placements tended to be from three counties: Indian River, Palm Beach, and Polk. Law-abiding and mentally competent citizens, who were victimized and falsely accused, were subjected to horrific abuse. "Consent" to treatment was coerced by assaults, beatings, threats, shutting off water, moving to unsanitary accommodations, and denial of privileges. Medically unnecessary, harmful, and contra-indicated drugs were forcibly administered with disastrous results: seizures, fainting, falling down, hair loss, nose bleeds, weight gain, aggression, depression, and memory loss.

28. Even patients who were properly placed in SFETC, because they were mentally incompetent to stand trial and they had committed crimes, were mistreated. One woman was given so many drugs that she could no longer stand up. Another very vocal woman was regularly beaten by staff in her solitary cell. Security officers badgered patients, encouraged and allowed violence, and incited riots. Scarce resources, such as telephone access, were used to pit patients against each other, rather than being allotted in an orderly fashion. Any attempts to report crimes or abuse were met with retaliation. I witnessed four patients locked in a closet-sized room with no supervision or bathroom access. One urinated on the floor and then threatened to punch the others who were sickened by the stench.

29. In Indian River County (IRC), I met several people who had been falsely arrested. An elderly lady was falsely accused of stealing a dog which had been entrusted to her care by the dog's owner. Her accuser appeared to be providing the officers with drugs and sex. A professional electrician was falsely accused of breaking into a car that he formerly owned. His accuser was an alcoholic neighbor with ties to the police department. A Ukrainian woman was falsely arrested because she had been hit by a car while crossing the street. Apparently, false arrest is big business in this County. Several people have corroborated the information posted on this website: www.ircjudicialcorruption.com. The website contains federal testimony describing an IRC narcotics trafficking and racketeering operation involving various public officials and Coast to Coast Landscaping. This appears to be the same crime ring that perpetrated the burglary, vandalism, and other crimes against me.

30. San Diego, CA, has some very deep roots in corruption. Police involvement in drug trafficking runs rampant in this border town. False arrest is big business which targets disenfranchised populations, women and minorities, as well as dissidents and anyone who rebuffs the romantic overtures of powerful men. Healthy, law-abiding women are regularly railroaded into mental institutions because the police cannot find any penal codes under which to

book them in a false arrest. Section 5150 is used for harassment and retaliation rather than for public safety. In 2015 the DOJ released a scathing report on San Diego police misconduct. Weak federal efforts to curb the abuse have failed. San Diego continues to thumb its nose at rule of law. There is no enforcement.

FACTS

31. Please note that some of the dates are approximate, on or about. Because of the theft of many of my personal documents, I no longer have records of some of the exact dates. I have diligently tried to reconstruct the information as accurately as possible.

<u>San Diego, CA</u>

32. Aug. 31, 2008 - While enjoying my daily swim at La Jolla Cove, I was endangered by motorboats encroaching on the swimming area, sexually assaulted by lifeguard John Kerr who grabbed my breast, falsely arrested, and taken to a mental institution. After 20 hours of wrongful imprisonment, I was examined by the County psychiatrist and found to be mentally healthy. The psychiatrist stated that there had been a "misunderstanding". The Police issued an immediate statement that I had not committed any crime.

33. Sep. 2008 - I reported the sexual harassment to the police, the mayor, and the city attorney. No response. I offered to settle the matter for improvements to public safety and an agreement requiring the City to abide by law, no cash. The City refused. The City indicated that it had no intention of obeying the law and objected to any contract that would require as much. I reported the City's refusal to abide by law to the California Attorney General, Jerry Brown. He refused to address this misconduct.

34. Sep. 2008 – Because of the City's inappropriate response, I had to file a restraining order against John Kerr, the lifeguard who grabbed my breast. Before the Aug. 31 incident, John Kerr was assigned to La Jolla Cove once or twice a week. After I complained about him, he was there every day. As I mentioned above, I swam there every day, and I was a member of the adjacent La Jolla Athletic Club. An army of lifeguards and peace officers attended the hearing in an

VERIFIED COMPLAINT

attempt to intimidate me.  After I complained, lifeguards began filing false reports, although no reports had been filed immediately after the Aug. 31 incident.  Notably, the belated, fabricated lifeguard reports accused me of assaulting a lifeguard, overturning kayaks, and disorderly conduct.  Of course, this did not happen.  The Sep. 1 police statement affirms that I did not commit any crime.  The City filed an unconstitutional countersuit to prevent me from entering the park.  Due process was denied.  Justice was denied.  I was coerced into signing an agreement to give up my rights.

35. Feb. 2009 – John Kerr sued me in small claims court alleging that I harassed him, when in fact, he had used his power and authority to sexually harass me.  Kerr testified that his fellow lifeguards teased him about wanting to date me.  Kerr testified to the "Lord of the Flies" culture of the San Diego Lifeguard Service, which was sorely lacking in maternal supervision.  Kerr also committed perjury.  A corrupt court found in his favor.

36. Mar. 2009 – While shopping at Whole Foods in La Jolla, I asked that the store go smoke-free by requiring its employees to refrain from smoking in front of the entrance, in accordance with local clean air laws.  The Assistant Manager, a smoker and a member of Hell's Angels, intervened creating a scene.  He initiated an altercation in which he was very demeaning.  He misstated facts.  I corrected him.  He banned me from shopping in the store.  I had been shopping at Whole Foods since they were a sleepy co-op in Austin, TX, in the 1990's.  I have done a great deal of volunteer work, with Action on Smoking and Health (ASH) and other groups to protect the public health against tobacco smoke, a known carcinogen.  This was the first attack on my access to food.  It appeared to be orchestrated by the City's power base and the tobacco industry.

37. Aug. 2009 – I filed a false arrest, medical malpractice, and sexual assault action in state court.  The City used undue influence to get my lawyer, Thomas Massey, to withdraw from the case.  Massey's motion to withdraw was improperly filed in open court, rather than in camera.  Massey's supporting declaration breached attorney-client privilege, attempted to mislead the court, contained false and perjured statements, and asserted an unqualified medical opinion.  His statements were defamatory.  I filed a complaint with the state bar.

38. Oct. 26, 2009 – I was stung by a stingray while swimming in the ocean. Symptoms from the venom were debilitating and lasted several months. I am still healing from this injury. This incident may or may not have been related to the lawsuit. It is worth mentioning because of the timing of this unusual event. The undue influence and withdrawal of my lawyer occurred simultaneously.

39. Jan. 2010 – I hired another lawyer, Alicia Dern. The City again exerted undue influence to get her to drop the case. I contacted every civil rights lawyer that I could find. They all declined my very strong case. Some of them (Keith Rutman, Brian Pease) tried to gaslight me. Others (Michael Marrinan) confirmed that I had a strong case, but still declined to represent me. I paid some of the lawyers to advise me, but not represent me (John Serrano, Nick Lewis, Stephen Ostrow). These lawyers were also co-opted by the City. After being swindled and betrayed by several attorneys, I decided to learn the law and conduct the case myself.

40. June 12, 2010 – Dr. Lawrence Woodburn performed a thorough 5-hour psychological examination and found me to be in perfect mental health, except for some emotional distress from the false arrest. Dr. Woodburn found that the Aug. 31 involuntary hospitalization was not authorized by law and breached professional standards.

41. July 2010 – A Smart Meter was installed on my home at 5911 Chateau Dr., San Diego, CA 92117. I was working on my objection to the City's motion for summary judgment at the time.

42. Aug. 2010 – Although the material facts were disputed, the state court improperly granted summary judgement. I appealed. I was subjected to numerous stop and frisks, in an attempt to coerce me to drop the case. Park rangers at the beach carried out most of the illegal stop and frisk detentions. One time, a park ranger stopped me as I was driving through the park, ordered me to cut the engine, and then issued a parking ticket, in an obviously illegal entrapment scheme. The illegal stop and frisks continue to this day, only in certain jurisdictions and only when the officers recognize that I am the person who reported police misconduct. When I am in other jurisdictions or incognito, I am not targeted.

43. Sep. 2010 – I filed malpractice claims against my lawyers, Massey and Dern, and the experts, Dominick Addario, the City's psychiatrist who wrongfully diagnosed my mental health without examining me, and my police expert, William Flynn, who intentionally missed the deadline. Like my lawyers, my police expert was working to advance the City's interests, not mine. The Dern case settled quickly as an insurance carrier stepped in to handle the claim.

44. Dec. 2010 – My common law husband, John Tallent (JT), suddenly became seriously ill with a heart condition. Prior to this, he had been in excellent health, a world champion athlete. He was suffering from radiation injuries. The microwave radiation levels in our home were very high from the Smart Grid deployment. There may have been additional radiation sources, such as our telephone provider, AT&T, the neighboring City fire station, and police and military activity. JT was treated at the VA hospital with a cardioversion and various pharmaceuticals. His condition stabilized.

45. Feb. 2011 – My cat, Mimi, who was suffering from similar radiation injuries, finally ran away from home. Mimi was a house cat, who always stayed close to home. She did not like to get her paws dirty. When we found her a few days later, she was severely dehydrated and her heart was racing. After this, she rarely stayed inside the house, preferring to be outside. A few months later Mimi died from the constant radiation onslaught.

46. Apr. 2011 – I filed my appellate brief in the San Diego sexual harassment case.

47. Apr. 2011 – At approximately 5 pm, I suddenly heard a high-pitched microwave frequency that was transmitted into my home. I have been hearing this frequency ever since, no matter where I go. A few days after this event, I started feeling nauseous and had gastrointestinal discomfort. I recovered quickly. I later learned that this mysterious illness is known as microwave sickness, although it is actually an injury.

48. May 2011 – One of my students told me about his friend who had to leave CA to recover from Smart Grid radiation injuries. My research showed that thousands of similar injuries were being reported. I reported the radiation issue to the utility, San Diego Gas & Electric (SDG&E), the California Public Utilities Commission (CPUC), and the State Attorney General, Kamala

Harris. I asked that the Smart Meter be removed. SDG&E and the CPUC denied my request. Harris ignored my request.

49. Aug. 2011 – I was the last person in the house to be debilitated by the dangerous radiation levels. Radiation injuries prevented me from working on the aforementioned legal claims. I could no longer tolerate teaching music in my home studio. I rescheduled the music lessons to my students' homes, where I felt fine. I could no longer eat at home because the radiated food made me sick. I started eating out, where I was able to digest my food normally. I could no longer sleep in my house. I had to find other places to sleep. Every four hours, at precisely 1:00, 5:00, and 9:00, I felt a strong radiation pulse which caused cascading heart attack symptoms (chest pain, arrhythmia, difficulty breathing). This only happened inside my house. If I stepped outside, I did not feel the pulse or experience the symptoms. Finally, I left my home and drove to WV, where I healed.

West Virginia

50. Sep. 2011 – I arrived in a small town in WV, where I arranged to stay with friends for a few weeks while looking for a home. I was not harassed by police while staying there. The jurisdiction apparently had not been compromised. This was one of the few respites in the many years of ongoing police misconduct.

51. Sep. 2011 - I was forced to drop the Addario malpractice case because of my radiation injuries and displacement. This was extrinsic fraud on the court. Addario and his lawyers committed intrinsic fraud on the court by filing a dishonest motion to strike.

Green Bank, WV

52. Oct. 2011 – I rented a house in the radio-free zone of Green Bank, WV, where I lived in perfect health for a while. I met many intelligent, well-educated people who had suffered similar radiation injuries. We gave several interviews to the press. There is animosity between the longstanding residents and the newcomers who arrive to work at the National Radio Astronomy Observatory (NRAO) or to heal from radiation injuries.

53. Nov. 2011 – While ordering telephone service, I was harassed by locals, as well as Sheriff Jonese. Deputy Shinaberry illegally detained me, demanding my social security number. I refused, stating that I was not required to provide this. He threatened false arrest, so I gave him the number. He wrote it on his hand and used it to tamper with my telephone service.

54. Dec. 2011 - The Massey malpractice case settled for a nominal amount after Judge Randa Trapp argued Massey's case for him. Trapp refused to recuse herself despite a conflict of interest. Her husband was a San Diego deputy. The police expert malpractice case settled for a nominal amount after bullying and threats of sanctions by defense counsel. Blatant misconduct abounded and justice was denied.

55. Jan. 2012 – My WV rental was abruptly sold to a local man, uprooting me again. I rented another house.

56. Mar. 2012 - I contacted numerous attorneys asking for representation on the Smart Meter issue. All of them declined the case.

57. Apr. 2012 – The San Diego appeal was denied after the three Justices breached ethics by making up their own set of facts, which differed significantly from the facts submitted by the parties. The Seventh Amendment and the CA constitution Article I Section 16 guarantee the right to a jury trial to decide facts. Moreover, an appellate court is empowered only to decide points of law. Facts must be decided in the trial court by impaneling a jury. To address this glaring error, I filed a petition for rehearing, which was denied, and a petition for certiorari which was also denied. I wrote certified letters to all of the appellate justices informing them of their colleagues' transgressions and setting forth their duty to take corrective action. No response.

58. Apr. 19, 2012 – The CPUC approved analog meter options for SDG&E customers. I opted out.

59. May 2012 – After giving a piano and vocal performance at the Greenbrier, I drove to my accommodations at about 1 am. I missed the turn and had to make a U-turn at the traffic light. A White Sulphur Springs policeman stopped me and gave me a bungled citation asserting that I

made an illegal U-turn. I objected. The next week, I went to City Hall to look at the municipal codes and found that I was correct. The U-turn was perfectly legal. As I was looking at the codes, I was falsely arrested. The officer tore up my citation and reissued it as an arrest warrant for making a U-turn. I was arrested, booked, fingerprinted, and released on bail. WV law prohibits arresting a person who has already signed, agreeing to appear for an alleged traffic infraction. The arrest was contrary to law and for the sole purpose of harassment. The court dismissed the bogus citation.

60. June 2012 – The Greenbrier wrongfully terminated my employment because of the false arrest.

61. June 29, 2012 – An unusual and powerful windstorm called a "derecho" devastated Green Bank, ripping up large trees by their roots and knocking out power for days. The Governor declared a state of emergency. National Grid crews arrived from New York and New England to deploy a Smart Grid while repairing downed electrical lines. When power was restored, my electric meter was transmitting radio frequencies, in violation of state and federal laws protecting the quiet zone. Again, I started experiencing radiation injuries. My friend, William (Bill) Swearingen, who had been staying with me, could no longer sleep in the house and opted to sleep in his van. I invited a few other friends to sleep at my house. All of them experienced similar injuries from the high radiation levels.

62. July 2012 – A few days after a meeting in which I spoke out against the Smart Grid, the NRAO banned me from the property which is open to the public, threatening false arrest for trespass.

63. Aug. 2012 – Bill became very irritable and threw a bucket of paint at me. I reported the assault to the Sheriff, who stated "In domestic violence cases, our policy is to either arrest both parties or neither." This policy is, of course, unlawful because it requires the arrest of a domestic violence victim without probable cause. Again, I was denied police protection. Unable to resolve the radiation problem, I drove across the country, back to my home in San Diego. As soon as I passed the GWEN towers at San Diego State University, I was debilitated by the

radiation. I continued to drive home, but I could not tolerate the radiation levels in the neighborhood, even though the Smart Meter had been removed from my home. I immediately left.

64. Sep. 2012 – While traveling across the country, I filed a state court action regarding the Smart Meter injuries, seeking an injunction. As I mentioned above, my earlier attempts to settle this issue out of court had failed.

65. Oct. 2012 - I returned to Green Bank and rented a cabin with no electricity, where I slept peacefully. I also rented a condo where I cooked, showered, and worked.

66. Nov. 2012 – My car was vandalized. One tire was slashed. I called AAA, who dispatched a service truck. It never arrived. All of the vendors in Pocahontas County refused the job, and a truck had to be called in from Marlinton after a long delay.

67. Dec. 17, 2012 – After my attempts to negotiate a no cash settlement failed, I filed a 49-page federal complaint, removing the state Smart Meter case to federal court. My legal work was highly commended. Other lawyers copied portions of my work in their own filings. There was some press coverage of the case, followed by a lively discussion among readers. Many people who had suffered radiation injuries posted their testimony and the supporting science. Shills for the wireless industry posted harassing and abusive comments. They made numerous defamatory statements accusing me of mental illness. The gaslighting continues. I attempted to mediate the discussion, urging truth and civility while discouraging insults and abuse. John Kerr, the offending San Diego lifeguard, posted a misleading comment falsely accusing me of committing a crime, when in fact, I have never committed any crime. Kerr was cyberstalking me.

68. Jan. 2013 – While shopping for food, household items, and winter boots at Walmart in Lewisburg, WV, an employee stole my shoes, a very nice pair of cerulean blue Saucony's, perfectly broken in. I walked around the store asking for my shoes, but the employees refused to help. The boots, like most shoes at Walmart, had RFID tags that were bothering me. The police arrived, although I did not call them, and I reported the theft. The police refused to arrest the employee who stole my shoes and instead threatened to falsely arrest me. The police aided and

abetted the thief. I wanted to leave the store, but I could not go out barefoot in the snow. The officer cut the tags off of the boots and told me to take them. I did not want the boots, and I was not willing to swap them for my shoes. Nevertheless, threatened with false arrest, I left without my shoes. I immediately gave the unwanted boots to a thrift store. Walmart refused to compensate me for my shoes.

69. Feb. 2013 – My car broke down and I called AAA. I was stranded for days as AAA searched for a vendor. Again, every vendor in Pocahontas County refused to respond to the emergency.

<u>Florida</u>

70. Mar. 2013 - I leased a house in Barefoot Bay, FL. The landlord breached the contract in another effort to keep me homeless. I rented another house in Sebastian.

71. Apr. 2013 – AT&T's faulty installation of telephone service caused excessive radiation levels in my Sebastian house. The telephone line was erroneously connected to the electric meter. A serviceman was sent out to fix the problem, but instead he made a false police report and tried to have me arrested. At the behest of AT&T, the Sebastian police continued to harass me over several weeks, noting Sig 20 which is cop slang for mentally ill. The gaslighting efforts continued. I disconnected the phone service.

72. Apr. 30, 2013 – After my diligent efforts to settle the matter for improvements rather than cash failed, I filed a 42 U.S.C. §1983 action to address the White Sulphur Springs police misconduct. I asked for an injunction.

73. May 2013 – I took a wrong turn off Highway 510 when returning home about 9 pm. Instead of turning right onto 66th Ave., I turned onto 64th Ave. I was again subjected to an illegal stop and frisk. I asked why I was being stopped. The Deputy answered "There is a meth lab in that house over there." He was stopping everyone who drove down the dead-end street, looking to arrest small-time drug addicts while aiding and abetting the drug traffickers. I was detained for about 15 minutes, the let go. This is exactly what the Sheriff did to my house in 2015 over my objection, installing drug dealers and then aiding and abetting their illegal activities.

74. June 2013 – I filed a 42 U.S.C. §1983 action to address the lack of due process in the San Diego sexual harassment case. Again, I asked for an injunction against the flagrant misconduct. Over the few days that I was preparing the documents, someone broke into my house and vandalized my computer. The burglars did not steal anything, but attempted to deter me from filing the action. I continued my work at the library. This may be the reason that I was later harassed at the library.

75. July 2013 – I was subjected to much police harassment over the summer. Sebastian police would use a bogus noise complaint or a "wellness check" as an excuse for illegally storming my house, entering without warrant or consent. I wrote a letter to the police chief to address the ongoing misconduct. The chief refused to stop the harassment. The harassment has continued unabated to the present time and occurs in all Indian River County as well as San Diego County jurisdictions. The police harassment is usually handled in a manner designed to insult me rather than serve the public justice. The police description of me is "fat" or "200 lbs." or "gray hair", when in fact my hair is blond and I have never weighed 200 lbs. Sig 20 or some similar mental illness designation is used. The gaslighting continues.

76. Aug. 2013 – I was falsely arrested while shopping at Publix in Sebastian. I was falsely accused of trespassing by shopping in a store that was open to the public. The officer forced me to sit in his vehicle for 30-40 minutes while he used wireless communications devices or energy weapons. I suffered radiation injuries. The officer released me with a written threat of another false arrest if I ever shopped at that Publix store again. The store manager who signed the document was a smoker and a member of the Hell's Angels motorcycle gang. I consulted several local lawyers to address the police misconduct. The lawyers were very hostile and strongly recommended against taking legal action. They also gave me false information about the applicable laws. My access to food was again unlawfully restricted.

77. Sep. 6, 2013 – Florida issued me a driver's license and car registration in the St. Lucie County office. A few days earlier at the Sebastian office, the clerk required me to sign an affidavit certifying the wrong mileage and agreeing to be arrested for the error. I refused and

asked her to please proceed according to law. Instead, she made a false police report. The Deputy detained me for 20-30 minutes and issued a trespass warning preventing me from visiting any tax collector's office in the County. Asst. County Attorney Bill DeBraal confirmed that the ongoing threat of false arrest for trespass was still in force in 2017.

78. Sep. 13, 2013 – While I was conducting ordinary business at the Indian River County Library, Vero Beach Police Officer Brock came to the computer where I was working and wrongfully detained me. He accused me of trespassing. I explained that I had a right to be in a public place that was open to the public. I asked him to comply with law. He agreed not to arrest me or issue any citation. With his permission, I left.

79. Oct. 1, 2013 – My summer lease ended and I rented another house in Sebastian. Again, I ordered telephone service through AT&T. Again, AT&T created a wiring fault, connecting the telephone wires to the Smart Meter. I had to disconnect the service. Again, I was denied telephone access. During this time, Florida Power & Light (FPL) activated the Smart Grid, causing me to suffer additional radiation injuries. After a month, the landlord breached the contract and forced me to move. I soon realized that I would not be able to lease another home because I had been effectively shut out of the market by the local real estate industry. I stayed with a friend and worked on buying a house.

80. Jan. 2014 – I was working on the San Diego sexual harassment case at a friend's house when the power suddenly went out. My computer was damaged by the power surge and my work was lost. Because of the constant tampering with my computer equipment, the library was the only place that I could get the legal work done. Hence, my right to access the library was under attack.

81. Feb. 2014 – I gave contracted piano and vocal performances at Season's 52 in various locations throughout Florida. Management suddenly started berating me, telling me that they were getting complaints about my performance from the guests, but refusing to document the guest's comments. Management did not like my costumes or certain songs that I played. I was overly accommodating, offering to play songs of their choosing and to wear costumes that they

provide or select. I recorded my show proving that I objectively delivered a high quality performance equal to or exceeding the levels of other Seasons 52 pianists. They kept baiting me to walk away from the job or lash out. I did neither. I remained overly accommodating. They gradually fired me by reducing the contracted work little by little. Seasons 52 had given the same treatment to several female entertainers before me. I filed an Equal Employment Opportunity complaint. My firing may have been related to my federal lawsuits.

82. May 2014 – While visiting Seacoast National Bank to inquire about a mortgage, I was accused of trespassing and falsely detained by police. A trespass warning was issued in violation of federal Equal Credit Opportunity laws. My access to credit was being restricted. I later learned that Seacoast specializes in banking for law enforcement personnel.

83. Aug. 10, 2014 – I was falsely arrested for trespass while conducting ordinary business at the library. I had a constitutional right to be in a public place open to the public. (Brown v. Louisiana, 383 U.S. 131 (1966)) Officer Joerger asserted that a trespass warning was issued by Officer Brock on Sep. 13, 2013, almost a year prior. No warning was issued. Even if a warning had been issued, it was unconstitutional. Nevertheless, I offered to leave, but Officer Joerger detained and arrested me. He did not obey Florida law requiring all elements of the misdemeanor (including the order to leave) to take place in the presence of the arresting officer. The arrest was contrary to law for many reasons. The arrest and prosecution were malicious attempts to prevent me from litigating my 3 cases in federal court. This is external fraud on the court.

84. Oct. 2014 – Thomas Kennedy, my lawyer in the trespass case, unlawfully withdrew after failing to file a motion to dismiss. Kennedy took my money, but never had any intention of representing my interests. He was beholden to someone else.

85. Oct. 29, 2014 – After working for months to arrange the financing through an FHA loan, I bought my home at 4636 26th St., Vero Beach, FL. Vero Beach has a city-owned electric utility which does not use a Smart Grid.

86. Nov. 26, 2014 – U. S. District Court dismissed the Smart Meter case with prejudice for lack of jurisdiction. The Court erroneously opined that the due process violations and bribery scandals of the CPUC must be decided by the corrupt CPUC, not by the federal court. The Court ridiculously decreed that it had no jurisdiction over any of the constitutional issues presented in the case. Somehow, the Court found the power to dismiss with prejudice, preventing me from refiling in another jurisdiction, although it concurrently found that it had no jurisdiction. Thus, the judgment is void. I appealed.

87. Dec. 2014 – I filed a motion to dismiss the trespass case, then requested a public defender. Kiernan Moylan was assigned. He misled the court, stating that my motion was not sworn, when in fact, it was. He refused to adopt my motion or file a better motion to dismiss, himself, even though I was legally entitled to dismissal. He harangued me in the lobby of the courthouse while I listened and said nothing. When he finished, I patiently tried to correct him, but he walked away. Based on this interaction, he filed a motion for a mental examination. More gaslighting. I fired him and conducted the case pro se, filing a petition for a writ of mandamus in the Florida Supreme Court to compel the dismissal as well as address the ethical violations of both the prosecutor and Moylan. I also filed a habeas corpus petition in the U. S. District Court based on Brown v. Louisiana (Id.) and the malicious prosecution. Both petitions were denied.

88. Feb. 2015 - State Attorney filed nolle prosequi after the gaslighting attempts to put me in a mental institution failed. I had waived my appearance and requested to be tried in absentia, in accordance with Florida criminal procedure. Because the charge was a misdemeanor, they had no legal vehicle with which to drag me into court. The corrupt public officials began working on a new plan to set up a false arrest and malicious prosecution for the purpose of gaslighting, harassment, and defrauding the courts. This time they would have to invent a felony in order to put me in a mental institution.

89. June 22, 2015 – After my appeal was unlawfully denied, I filed a petition for certiorari in the U.S. Supreme Court in the Smart Meter case. The clerk unlawfully refused to file it. I did not

receive timely notice because my mail was being tampered with. I was unable to refile the petition because of the extrinsic fraud on the court described below.

90. June 2015 - Late in the month, I received word that JT was seriously ill and in the VA hospice. I dropped everything and drove to San Diego to take care of him.

San Diego, CA

91. June 29, 2015 – While I was en route to San Diego, the U. S. District Court denied my motion to reconsider in the San Diego sexual harassment case. I appealed. The defendant public officials had committed intrinsic fraud on the court in order to obtain the dismissal. As I later found out, they were also in the process of committing extrinsic fraud on the court by depriving me of both of my homes, stealing my personal possessions, denying me access to the public libraries, tampering with my mail, interfering with my employment, and possibly even killing my husband. They went to great lengths to ensure that my appeal was never heard. They had no problem committing serious crimes against me, since they have never shown any respect for the law.

92. July 2, 2015 – I arrived in San Diego late in the day. Around 10 pm, after attending to the house, I went to the hospice to see JT. He was able to communicate, but unable to form words. He was trying to tell me something very important, such as who was killing him and how. I was not able to comprehend the details. He communicated that he urgently wanted to go home. I told him that I would come back tomorrow with his clothes, shoes, and wallet. This was my mistake. I should have taken him home in his hospital gown. I did not realize that he was in grave danger. At this point, JT was not in good health, but he was not on death's doorstep either. We expressed our love for each other and I left around midnight.

93. July 3, 2015 – I collected JT's personal items and went to the hospice to bring him home. He was unconscious. I could not wake him up. Later in the evening, there was a wild methamphetamine party at my house. People were moving the furniture to block the hallways. I walked in and told everyone to leave. They refused. The San Diego police were called to my

house on almost a daily basis. The police refused to arrest the offenders, but repeatedly threatened to falsely arrest me. I was denied police protection.

94. July 4, 2015 – As I was getting ready to go visit JT at the hospice, his friend Larry Asher arrived and informed me that JT had died. I was shocked because he had a lot of life in him when I saw him the day before. Larry spent a lot of time trying to distract me and convince me that JT had died of heart failure. Larry had spent his career as an engineer for Bell and Howell. Joanne from the hospice worked exceedingly hard to convince me that JT died of heart failure. Kathy Robert, who was in my house at the time, told me that he had been drugged with fentanyl. I never got to see his body. He was swiftly cremated. I don't know who paid for the service.

95. July 2015 – Mischief ensued at my San Diego house. My belongings were stolen. My mail was stolen. I did not receive many of the important court documents that were mailed to me. The FL tags on my car were stolen. Money was stolen out of JT's bank account. Washington Mutual refused to look at the ATM video to learn who was stealing from JT. The trespassers refused to leave and the police, who were summoned almost daily, refused to enforce the law and continued to threaten me with false arrest. I confiscated drugs that were in my house when I arrived and turned them over to the police, who gave them back to the drug addicts in my house. The police were using some kind of emissions that were making me ill upon each encounter with them. The emissions may have been from communication devices or energy weapons such as tasers. I was again denied police protection. Restraining orders were filed against me to unlawfully keep me out of my own home. I filed restraining orders and evictions against the trespassers. The courts overwhelmingly found in favored of the trespassers. The San Diego Library threatened to falsely arrest me for trespass, just as the Indian River County Library had done the previous year.

96. Aug. 2015 – After Vero Beach and Indian River County refused to settle the matter for no cash, only agreements to obey the law, I filed a 42 U.S.C. §1983 action to address false arrest for trespass by visiting a public library. Again, I asked for an injunction against the police and prosecutorial misconduct.

97. Aug. 20, 2015 – The Ninth District Court of Appeals issued an order requiring my opening brief to be filed by Nov. 27, 2015, in the San Diego sexual harassment case. My appeal had an excellent chance of success, not only because I was entitled to relief under the law, but also because the Ninth Circuit in San Francisco was outside of the sphere of influence of the corrupt San Diego officials. Judge Alex Kosinski, who has repeatedly ruled against police misconduct, was on the appeals court at that time. I never filed the brief due to the extrinsic fraud on the court.

98. Sep. 2015 – After spending the summer fixing up my San Diego house and dealing with JT's passing, I drove back to Vero Beach late in Sep. AT&T connected the telephone line to the electric meter in my San Diego house, causing the same radiation issue that I had witnessed in Sebastian. The trespassers suddenly could not tolerate the house nor could I. Again, I had to disconnect the service. Again, I was denied telephone access.

<u>Vero Beach, FL</u>

99. Oct. 2, 2015 – I arrived in Vero Beach to find trespassers in my home. I ordered them to get out immediately and they did.

100. Oct. 2015 – Michael Hnatusko and Cynthia Little from Pennsylvania frequently stopped at my house to inquire about renting. I declined. Hnatusko wore a shirt that said East Coast Tree Service (an affiliate of Coast to Coast Landscaping). I verified his employment by calling and emailing the company. Little stated that she paid Diana McAnulla $500 to rent a room in my house. I explained that Diana did not have any authority to rent out my house. I later learned that Little had forged Diana's signature on the receipt.

101. Oct. 12, 2015 - Hnatusko stopped by my house with a black eye. He said that he had a four-wheeling accident, that he was out of work for a while recovering, and that he and Little still needed a place to stay. I offered him a week's vacation at my house in San Diego. I told him that there were people in the house that did not belong there. I asked him to be annoying, sloppy, and difficult to live with, the roommate from hell. I offered to pay the airfare and to let Little stay the week in my Vero Beach house. Naively, I thought this was a win-win arrangement. I

was defrauded. At the time, I did not know that Hnatusko and Little were working with the Sheriff to destroy my home and defraud the courts, nor did I know that Coast to Coast Landscaping was working with the Sheriff to flood the area with illegal drugs. I learned all of this a few weeks too late.

102. Oct. 13-20, 2015 – Little was working closely with a person named Larry at Coast to Coast Landscaping. She repeatedly asked me for money. I did not have any money to give her. She told me that she needed some Sudafed for her sinus condition. She asked me to buy it for her. I refused based on my rejection of Western medicine. I educated her on natural remedies which are more effective than Sudafed. I later learned that Sudafed is used in the illegal production of methamphetamines. I later realized that both she and Hnatusko were drug addicts.

103. Oct. 20, 2015 – Little signed a surrender-and-release form stating that neither she nor Hnatusko had any right to my Vero Beach home. They agreed to leave. Hnatusko returned from San Diego. He was enraged that he had not been able to stay at my house in San Diego because the police prevented it. He began intimidating me.

104. Oct. 21, 2015 – When I arrived home and found Hnatusko in my home, I reported the trespass. Hnatusko threatened to break my fingers and to kill me and my relatives. I reported this assault as well. Again, I was denied police protection. The deputies accused me of threatening to kill Hnatusko, but they did not arrest me. Instead they told me all about my San Diego home. They unlawfully gave me legal advice regarding the San Diego eviction case. They kept on asking me about my lawsuit against the County. They jeered "How's that working for you?" I answered that it was working fine, but it would work better if the courts were just. The deputies were pressuring me to drop the case.

105. Oct. 22, 2015 – I found chemical soaked towels in my home. They reeked. I also found a bent spoon that was burnt on the bottom. It appeared that Hnatusko and Little had been cooking their drugs in my house. They had also put some kind of chemical perfume in my home music studio. The chemical appeared to be some kind of mafia protocol for marking their intended victim.

106. Oct. 23, 2015 noon – Hnatusko trespassed into my home to try to extort money from me. He began by offering me a partnership in the meth lab that he intended to set up in my house. I refused. He then demanded $10,000. I did not have $10,000. He gradually reduced his price to $700. I agreed to borrow $700 and pay it to him if he would stop his attack on my home. During the course of the conversation, he talked about my Smart Meter lawsuit and offered his ludicrous opinion that JT had suddenly died because he had smoked marijuana in his youth. Hnatusko explained that he was working with the Sheriff to use my house to traffic narcotics, to put my home into foreclosure, and to have me locked up in a mental institution and drugged. I did not believe him. Nevertheless, it all came to pass.

107. Oct. 23, 2015 4:30 pm – I arrived home to find Hnatusko and Little in my driveway covered in grease having dismantled their pick-up truck with Pennsylvania plates. I told them that I had the $700 that we had agreed on. All they needed to do was sign for it, put their truck back together, and go on their way. I walked into the house from the carport side-door. They followed me. They backed me into the corner of my music studio and threatened me. Little pushed me into the corner with her hand. She put her cell phone in my face and recorded a rehearsed scene. Hnatusko said "Put down the gun." I said, "I don't see a gun. What gun? Are you concealing a weapon? Let me go. Stop hurting me. Get out of my house." As soon as they let me go, I fled.

108. Oct. 24, 2015 – I went to the library to write a report of the trespass, assault, battery, extortion, drug violations. At closing time, I left the library and got in my car. I did not want to go home because of the threats leveled against me by criminals that the Sheriff had essentially installed in my house. I sat there for a few minutes. Three or four Sheriff's vehicles swooped into the parking lot and blocked me in. The deputies ordered me out of the car. I was barefoot. I reached for my shoes so that I could obey their order. They told me to put down the bag containing my shoes. I explained that I was simply trying to obey their order and I needed my shoes to do so. The deputies lied about this in their report. I asked why I was being detained. They said they had an arrest warrant. I asked to see it. They could not produce it, and in fact,

they did not have a warrant. Deputy Scott Sposato arrived, high on drugs. He began questioning me. I answered all of his questions. I reported the crimes that I had been writing up. After ten minutes of questioning, Sposato said, "That's it. You contradicted yourself." I asked what contradiction he was referring to. He refused to answer because there was no contradiction. He confirmed that Hnatusko was indeed working with the Sheriff. He falsely arrested me for aggravated assault with a deadly weapon.

109. Oct. 25, 2015 – I attended a bond hearing. I objected to the arrest based upon lack of probable cause. I asked for a probable cause hearing. My request was denied. Judge Morgan made a finding of probable cause with no evidence and no hearing. He issued an illegal "no contact" order, prohibiting me from accessing my house. I objected stating that the order violated my 5th Amendment right to my home. Morgan did not care. He said, "Then get them out of your house." Without the Sheriff's assistance, there was no way for me to do this.

110. Oct. 26, 2015 – I borrowed $5,000 and posted cash bail. Previously, I had contacted A-1 Bail Bonds, but I declined to sign their contract, preferring to post cash bail. Both the jail and the court clerk rejected my cash bail. I purchased a bank check and mailed it to the court with a citation of the applicable Florida statutes which required them to substitute my cash bail for the unexecuted A-1 bail bond. The Sheriff illegally seized and held my car for days. I paid over $200 to recover it. They had ransacked it.

111. Oct. 28, 2015 – Unable to access my Vero Beach home, I drove to San Diego, where I had another home. En route, I sent a letter with supporting documents and legal citations to the Sheriff again requesting the removal of the trespassers from my home. Attorney James Harpring responded and refused. He cited no laws on which to base the refusal to carry out the Sheriff's sworn duty.

San Diego, CA

112. Nov. 2015 – I was denied access to my San Diego home. The locks had been changed. The police and the landlord refused to let me in, although I had a valid lease. At one point, I did get in the house briefly, and saw that it was essentially in the same condition as I had left it in Sep.

Most of my personal possessions, furniture, etc. appeared to be there, although I could not access them. When I went in the house, there were people inside who physically pushed me out the door. JT's VW Rabbit was no longer in the driveway. It had been stolen.

Nov. 2015 - I worked on my eviction case. The defendants defaulted. I was entitled to a default judgment, but the corrupt court denied it. Christian Curry represented one of the defendants. Curry confirmed that someone other than the defendants had paid him handsomely to take the case against me. He refused to divulge the person's name. Eventually, the Sheriff unlawfully refused me access to the courthouse. This was a blatant violation of my federal rights to petition for redress of grievances, equal protection, and due process.

113. Nov. 2015 – I contacted many Florida attorneys asking for representation on the assault charge. Most declined the case. Some agreed to represent me, but withdrew the offer when they learned who I was (a falsely arrested whistleblower). A few agreed to take the case to trial, but refused to file a motion to dismiss based on Stand Your Ground or lack of probable cause.

114. Dec. 3, 2015 4 pm – The State Attorney filed an untimely charge of aggravated assault.

115. Dec. 7, 2015 – I filed a motion to continue the pre-scheduled arraignment, based on the State's tardiness and my right to counsel. I announced my intention to file a pre-arraignment motion to dismiss and if denied, submit a not guilty plea in writing in accordance with Florida criminal procedure. The State did not oppose. I was entitled to a continuance. Judge Robert Pegg unlawfully decided to ignore the motion and issue a bench warrant.

116. Dec. 10, 2015 – I filed a motion for immunity and dismissal under Stand Your Ground and other theories. I also filed a waiver of appearance authorized by Florida criminal procedure. The State did not oppose or traverse, thus admitting every fact stated in the motion, including the fact that I was innocent and immune from prosecution, the fact that there was no probable cause for the arrest, the fact that the Sheriff had engaged in entrapment, the fact that the trespassers had no right to be in my home, and the fact that the trespassers were working with the Sheriff to use my home in their criminal narcotics trafficking operation.

117. Dec. 2015 – I met a woman on the beach who knew of a rental house available in Mexico for $350/mo. This was much more affordable than my San Diego house, at $2,000/mo., which I could not even use. I drove to Mexico.

 Mexico

118. Dec. 2015 – I rented a house on the beach for $350/mo. I began giving musical performances in exchange for rent and food. For the first few months, I did not have access to a computer or my mail. Telephone access was difficult.

119. Feb. 2016 – As I began to get mail and online access, I started working on solving my many problems. My priorities were saving my houses and dismissing the trumped up charges against me. I did not have the wherewithal to also conduct my 4 federal 42 U.S.C. §1983 cases. This is how the defendants perpetrated fraud on the federal courts. All of the cases were simultaneously dismissed during this time. The WV case is the most telling. The judge ignored it for years, refusing to perform her duties. She tried to dismiss it at one point, but I objected. She continued to sit on it until the extrinsic fraud on the court could be orchestrated. Obviously, she was unduly influenced to participate in such a scheme.

120. Mar. 2016 –I filed a title insurance claim based upon lack of access to my Vero Beach house. Stewart Title denied it. I filed a 60-day notice of bad faith to the Florida Insurance Commissioner, as required by law.

121. Apr. 2016 – I discovered a radio transmitter and a cabin on a deserted part of the beach, which was used to coordinate drug shipments between the Mexican drug cartels and the corrupt local police. I began addressing this issue. I was immediately blackballed. My housing was again jeopardized. The Mexican police began harassing me, although I had enjoyed the previous 4 months gloriously free of police harassment.

122. Apr. 25, 2016 – The State of Florida did not traverse my motion to dismiss within 6 months of the arrest. Under Florida criminal procedure, the court was required to grant the discharge. It did not do so. I filed a petition for habeas corpus in the U. S. District Court. Magistrate Patrick White wrote a disingenuous report recommending dismissing the petition without due

consideration. In his report, he violated several laws. I wrote a detailed objection pointing out the violations. The court ignored me and dismissed the petition. Judge Robin Rosenberg may have had a conflict of interest arising from her husband's work as State Attorney. I appealed.

May 2016 – I filed a renter's insurance claim for my stolen furniture and personal possessions in my San Diego home. Farmers denied it.

123. May 30, 2016 – Agents of Florida kidnapped me, stole my car and everything in it, and brought me over the border. U. S. Border Patrol agents freed me from the kidnappers.

<u>Calexico, CA</u>

124. June 2016 - After being stranded for a few days with nothing but the clothes on my back, I bought a used car and drove to San Diego.

<u>San Diego, CA</u>

125. June 2016 – Displaced once again, I tried to pull my life back together. The police did not recognize me in the new car. I was incognito. There was no harassment. I was treated like a regular person. My stolen car was recovered from Mexico, but it had been destroyed. It reeked of the same toxic chemical perfume that Hnatusko placed in my home. The chemicals appeared to be the drug mafia's method of marking a victim. My car may have been used for meth production.

126. July 2016 – A lifeguard recognized me at the beach and the police harassment resumed. I started going to a different beach, and I was safe for a while. While shopping, I recognized one of the people who participated in the wild meth party at my San Diego house in July 2015 when JT was killed. Unfortunately, he also recognized me. Shortly thereafter, a nice young man approached my car at a gas station. He gallantly offered to pump my gas and wash my windows for me. He asked about music lessons, and I gave him my business card. This was a big mistake. I later realized that he was a drug addict sent to identify me. I smelled the same chemical on him.

127. July 26, 2016 - While shopping for a car, I was ambushed by a crooked used car dealer who had ties to the San Diego Sheriff. I was illegally stopped and frisked by a deputy who stated that

he was "checking everyone for warrants". The deputy was high on drugs and stole my car keys, my car, and everything in it. He gave it to the crooked dealer in some illicit arrangement. He falsely arrested me without a warrant. I was forced to have a chest x-ray at the jail, in violation of my religious practice. I suffered radiation injuries.

128. July 29, 2016 – I met with the public defender who advised me to sign a waiver of extradition. I refused. The public defender refused to defend my case, calling it "frivolous". I was denied legal representation. In a Faretta hearing, I was adjudicated competent to represent myself in court. I challenged the false detention.

129. Aug 2016 – I was held in solitary confinement with limited access to telephone and no internet access. My mail was tampered with by deputies. Sometimes, it was stolen. Other times, it was doused with chemicals that made me sick. These may have been the same chemicals that were earlier used to mark me as a drug mafia victim. I was prevented from contacting any lawyers. I was only able to contact three people by telephone, my mother, my father, and my fiancé. They all refused to help me find a lawyer. It appears that they were led to believe that I was mentally ill. They were also misled about the prevailing law regarding my case. The clerk's false comments led them to believe that I had not appeared and answered the aggravated assault charge in Florida, when in fact, I had. They were also led to believe that extradition was the only way out for me and there were no other legal options. They did not believe that I had committed any crime. They were at least intelligent enough to know that. I was served with a foreclosure action on my Vero Beach house. I filed a handwritten request for continuance.

130. Sep. 2016 – I filed numerous motions and collateral attacks. During transport to court or to consultations, I was unreasonably designated "high risk" and excessively shackled. Deputies prevented me from presenting a bona fide defense. I was allowed severely limited access to a word processor and a module with California and U.S. statutes and very little case law. I had no internet access, no access to most case law, and no access to Florida law. The deputies stole or delayed my mail delivery. I had limited access to mailing addresses and contact information.

Phone numbers and email addresses were useless in jail. I sent notices of the abuse to the DEA and the governors. I asked various non-profit groups for help. No response.

131. Oct. 2016 – San Diego Court ordered extradition, ignoring my motions, curtailing my right to pursue habeas corpus, and in violation of federal law. I had habeas corpus petitions pending in the 11th Circuit Court of Appeals as well as the U. S. Supreme Court. Transfer of custody was prohibited by federal rules of court. Core Civic carried out the extradition as a form of abuse. My ankles were shackled without socks or pants to buffer the metal from contacting my skin. I could not walk in the shackles because it was too painful. The officer hurried my along causing me to trip over the shackles. I fell and injured my left hand and knee. I was denied access to showers and meals for the entire week. I was given only lettuce and water on most days. Other persons who were on the same transport were offered showers and meals. I was singled out.

Vero Beach, FL

132. Oct. 26, 2016 – Court ordered a mental examination in what was supposed to be a hearing of my motion for immunity and dismissal. Judge Cynthia Cox guessed that I was not competent to stand trial nor represent myself in court. She had no authority to do this because the issue had already been settled in the San Diego Faretta hearing. Collateral estoppel prevented re-litigation of the issue. Cox had no intention of proceeding according to law. My mother had been gaslighted into obstructing justice by writing a letter to the judge misstating many facts and falsely alleging that I was mentally ill, although I had not seen her in years.

133. Nov. 2016 – I filed numerous motions and collateral attacks in various jurisdictions including Washington, D.C. and New Jersey, where my father lives. I prepared handwritten documents because I was not allowed access to a computer or word processor. I was allowed access to very limited statutes and case law only for a few hours a week in the middle of the night. Deputies stationed me in the middle of a hallway next to a wireless transmitter. In order to work on my defense, I was forcibly injured and deprived of sleep. I was denied internet access. My attempts to enforce rule of law were quashed or ignored. I also wrote to the DEA

and other non-profit and pro bono groups. No response. The deputies carried out various abuses against me as part of the gaslighting strategy. On one occasion, they left me naked, without a jumpsuit. The reclaimed water on the cell block was making me sick. We were served regular water only once a day. I filled up 6 cups to keep me hydrated all day. On one occasion I tripped on some loose linoleum while carrying water upstairs. My left knee was badly bruised and sore. Other inmates vied with me for the water. I asked the deputies for more. They argued that I was mentally disordered for thinking that the water served was any different from the reclaimed water. I pointed out that if it were the same, there would not be a run on water. The deputies were gaslighting me.

134. Dec. 2016 – I was taken to the psychiatrist. I declined the mental examination based on the pending appeal of the unlawful order. The psychiatrist diagnosed mental incompetency, without examination, based upon my desire to delay the examination until due process could be ensured and based upon the fact that I had been denied a shower during extradition.

Homestead, FL

135. Dec. 20, 2016 – I was involuntarily hospitalized at South Florida Evaluation and Treatment Center (SFETC). When I arrived, I was told to shower and shampoo my hair. I was not allowed access to any conditioner or comb. A security officer grabbed me when I emerged from the shower and dragged me to a treatment room. She and a nurse poked at me and forcibly tested my blood pressure. I explained that I do not use any Western medicine because of my religious beliefs, Christian Science and Do No Harm. The Officer again grabbed me and dragged me to another location. She kept sticking a cell phone in my face, just as trespasser Cynthia Little had done to me in my house. I avoid cell phones due to my previous radiation injuries. Cell phones make me physically sick from microwave sickness. She took photos of me with the cell phone, instead of using the installed camera equipment. She had to work hard to make me look crazy in the photos (by assaulting me and denying me a comb and conditioner) in another instance of gaslighting. The facility did not proceed in this manner with the patients who were actually mentally ill. I declined a mental examination, but I did state the facts and the law regarding my

case, which are matters of public record. I also advised that I am not and never have been mentally ill. I asked the Director to honor my First Amendment right to free exercise of religion and to abide by law. I did not consent to treatment. I asked if they were going to continue to forcibly treat me. She said ominously, "We will get your consent. Nothing bad will happen to you as long as you cooperate." I affirmed that I am very cooperative although I will never violate the law or my religious beliefs. The Director lied in her write-up of the conversation. She said that I "believed" all kinds of things that I did not believe. Facts and law are independently verifiable items; they are not my beliefs. The Officer grabbed me again and dragged me to another nurse who forcibly injected me with an unknown substance that they said contained tuberculosis.

136. Jan. 2017 – Eventually, I was allowed access to a comb and conditioner. I was denied access to a pen. I was prevented from continuing my legal work. Nevertheless, I did everything possible to gain my freedom and improve my situation. I explained the legal violations to SFETC doctors and administrators and to DCF employees. I asked to speak with their lawyers but they refused. One doctor told me that forcible drugging was the way they solved the problem, and that is exactly what they did. SFETC enlisted a patient to beat me up on two occasions, Jan. 3 at 10 pm and Jan 14 at 10 pm. The assailant broke my teeth with her blows to my head and broke my right hand which I placed over my head for protection. I reported the beatings to the police and DCF. Rose from DCF blamed me for being beaten, saying "You should have walked away." I replied, "I did. I ran away, but there is nowhere to go. We are locked in." SFETC turned the police away and retaliated against me for reporting the crimes. I was again denied police protection. My assailant was rewarded with early release. I witnessed this same scenario play out against other people, especially those who did not meet the criteria for involuntary hospitalization. I often helped them to report the crimes. We were thwarted and retaliated against. The assailants, who were in fact mentally ill and criminal, were rewarded with early release, extra snacks, or better treatment from the staff. Medication was used to cause aggressive behavior. SFETC and DCF tried to create an environment where all of the patients

beat each other so that they could say, "Look, she got her back for hitting her yesterday." This approach did not work with me. I am a non-violent person. I don't beat anyone, and I don't fight back.

137. Feb. 2017 – Staff continued the gaslighting efforts and were generally abusive, denying me access to food at times, returning laundry items dripping wet, etc. SFETC moved me to a dirty cell with no water and prevented me from participating in activities, such as exercise. Dr. Melendez paid me a special visit offering a deal: SFETC would move me back to my cell with water, stop the beatings, and allow me to participate if I consented to take a harmful drug, Risperdal. Dr. Melendez did not inquire about my medical history, which includes a grand mal seizure which required hospitalization, a serious sting ray injury, radiation injuries, and allergic reactions to every drug. He said "I am not here to care for you; I am here to medicate you." I witnessed the same mistreatment of others, especially those who, like me, were not criminal or mentally ill. Risperdal made me extremely ill, feeling faint, dizzy, nauseous, muscles cramping, and pre-seizure symptoms. I reported the problem and stopped taking the drug. Staff became enraged with me and vowed to get a court order to forcibly drug me to my death, if necessary. The doctors explained that SFETC does not comply with the standard of care; thus, they are unconcerned about any adverse reactions. I called everyone I could reach to ask for help. After months of refusing to help, my father finally agreed to step in and save my life. He agreed that I should not take this dangerous drug that was harming my health. He paid an exorbitant $20,000 to a lawyer to get me out of there.

138. Mar. 2017 – My lawyer, John Unruh, refused to adopt my motion for immunity and dismissal or write a better motion, which would have been in my best interest. He chose to take the long way around by filing a motion challenging the incompetency ruling, waiting weeks for me to be transported to the jail, taking his time to file a request for bail, and waiting another month for the prosecutor to drop the bogus charge, which never had any evidence to support it. Unruh also convinced the foreclosure judge to grant the continuance and appoint counsel, Susan Semmel.

Vero Beach, FL

139. Mar. 7, 2017 – I was transported back to the jail. I was forcibly X-ray scanned again, although I had not been out of custody in months. I offered to do a strip search in lieu of radiation, because of my pre-existing injuries. Deputies refused. The whole ordeal was extremely harmful to my health and was carried out for that harassing purpose, not for any legitimate state interest.

140. Mar. 10, 2017 1 am – Everyone in the cell block was forced to stay up all night and endure the x-ray scanner in another abusive shakedown. Again, my request for a strip search in lieu of the harmful x-ray radiation was denied. No contraband was found. The shakedown was without probable cause.

141. Mar. 13, 2017 - On the day of the bond hearing I was locked in a holding cell alone with excessive levels of radiation. I suffered injuries which lasted for days, including lung, throat, and sinus congestion. The cell was equipped with a device manufactured by Burle Industries. Both the Sheriff and Unruh breached my attorney-client privilege by allowing a deputy to be present in a confidential consultation where I explained that I could not tolerate the radiation-emitting device because of previous injuries. The deputy then relayed the confidential information to the judge and the prosecutor. The Sheriff and Unruh created other radiation-related health issues for me entering the courthouse and participating in the proceeding.

142. Mar. 24, 2017 – I was released on $5,000 bail with a GPS ankle monitor, which caused radiation injuries, including contusion of my right foot and swelling of my right foot, ankle, and leg.

143. Mar. 28, 2017 – I received notice that Hnatusko, the trespasser, had died.

144. Apr. 25, 2017 – The prosecutor filed nolle prosequi, the ankle monitor was removed, and the order keeping me out of my own home was dissolved. I began driving by my house every day, making a plan to safely get in. Lights were on and the house appeared to be occupied. Susan Semmel sent a letter demanding that the trespassers vacate the premises.

145. Apr. 25, 2017 4 pm – I met with Attorney Johnathan Rhodeback with Rooney and Rooney. He argued that I did not have any legal claim against the Sheriff or the insurance companies. He misquoted the law. I asked why he was telling me things that I knew were not true. He admitted that someone had paid him to do so. He refused to say who had paid him. Over several months I contacted numerous attorneys who similarly tried to gaslight me or just declined the case without comment. I was denied access to legal counsel.

146. May 18, 2017 – I drove to Jupiter to meet with Attorney Earl Mallory, who also tried to mislead me about my legal claims. He had previously agreed to represent me for a set fee. I agreed to pay the fee. When I arrived with my checkbook, he forced me to sign an agreement allowing him to decline the case. He stated that we could not proceed until I signed. He defrauded me. I was denied legal counsel.

147. May 19, 2017 – I met with Attorney Kevin Rollin. He made me wait 30 minutes in a conference room while he carried on a telephone conversation with a client who was a member of law enforcement. When he finally began the consultation, he made misleading statements about my case. He argued against my legal claims. He was referred to me by Murphy Walker, who I later learned was a large donor to the Sheriff's campaign. Rollin tried to defraud me. My access to legal counsel was restricted.

148. May 22, 2017 – I got into my home, accompanied by a realtor. The front door was unlocked, and no one was inside the house. The house had been vandalized and my personal possessions had been stolen or vandalized. I changed the locks immediately. I filed insurance claims within a few days, and I immediately began writing a police report. It took me a while to itemize the damages and to get repair estimates.

149. June 12, 2017 – I finished my work and filed the police report with the Vero Beach police and the Sheriff.

150. June 13, 2017 7 pm – Two deputies entered my home without permission or warrant. They intimidated and threatened me. They walked around inside my house and refused to leave. For my own safety and well-being, I locked up and left the deputies inside the house. The deputies

exited saying, "We have seen everything that we need to see here." Afterward, I went to the beach and swam in the ocean, as I do every day. The local police harassed me at the beach. They said they received a false call that I was drowning. I confirmed that I was not drowning. They refused to leave me alone. They sent out a boat which endangered me in the water. They threatened false arrest. They questioned my mental health. They engaged in harassment which mirrored the Aug. 2008 incident in San Diego. This was yet another illegal stop and frisk, two in one day.

151. Sep. 3, 2017 11 pm – My car broke down while I was pumping gas at Cumberland Farms. I asked the employees for a jump. They refused to help, but threatened to make a false call to the police. I walked around the block and found someone who could give me a jump start. The police harassed me at my car and issued a trespass warning, threatening to arrest me if I ever bought gas or anything else at that store. The police alleged that I did not ask nicely enough for assistance. This is ridiculous because if I had not asked nicely, the strangers would not have wanted to help me. This was another illegal stop and frisk. My car started with the jump, and I finally left with the permission of the police. My access to food and gasoline was further restricted.

152. Oct. 18, 2017 – A woman at the library threatened to hit me. I reported this to the staff, who refused to help. This was another attempt to prevent me from using the library.

153. Oct. 26, 2017 – My insurance attorney, Richard Benrubi, dropped my case after delaying it for over 2 months, collecting my confidential information, and breaching the contract. I was again denied legal representation, only a few weeks before the rescheduled Examination Under Oath (EUO).

154. Nov. 15, 2017 – The EUO for the ASI homeowner's claim was conducted by Lewis Brisbois, the same attorneys that represented the defendants in the Smart Meter case. This is a conflict of interest, as ASI has a contractual duty to insure me and Lewis Brisbois has received payment from the wireless industry.

155. Dec. 25, 2017 5:30 pm – I wished my neighbor, Dorothea Hollingsworth, a merry Christmas. She told me that there were many people coming and going in and out of my house while I was away. She complained about to noise and disturbance. I informed her that I had not authorized this. The Sheriff had unlawfully installed those people in my home. I did not rent out my house. Her son, Christopher Williams, interrupted us saying, "We're going to put you back in jail." Williams appeared to be working with the Sheriff and the drug cartel.

156. Dec. 29, 2017 1 pm – A man identified as Leroy was stalking me at the library. On several previous occasions he found me working on a computer and he would talk to other patrons about me trying to convince them that I was crazy. Someone had hired him to stalk, harass, and gaslight. On this day he came to my computer and carried on a long conversation on his cell phone. Although cell phones are prohibited in the library, the staff refuses to enforce this rule. I got up and moved somewhere else until he finished his conversation. I asked him to observe the library rules. Library staff threatened to falsely arrest me. Again, my access to the library was jeopardized.

157. Jan. 29, 2018 – Lewis Brisbois sent me the EUO transcript and errata sheet, after unreasonably delaying it for months. I signed and returned the errata sheet promptly. I asked for confirmation that they received it. No response. They continue to delay the claim.

158. Feb. 18, 2018 – Primo Music denied me employment because of the false arrests. They stated that although I am qualified and competent to teach music, I failed the background check.

159. Feb. 26, 2018 8 pm – I shopped for food at Publix, as I do almost daily. The manager harassed me, refused to let me buy the food in my cart, and threatened false arrest. For a few weeks prior, Leroy had been stalking me at Publix as well as the library. Again my access to food was compromised.

160. Mar. 7, 2018 – My car was vandalized at the library. A large scratch was left on the passenger door. A few months earlier a deep scratch was left on the driver's door, also while parked at the library. These incidents were yet another attack on my right to visit the public library.

161. Mar. 9, 2018 – Police surveilled me at the beach during my morning swim. I left the beach at 10:40 am to get to an appointment with Bill Terry, and insurance attorney. There was a very unusual traffic jam on A1A. I took the long way over the bridge to US1. A private construction truck was racing me all the way down US1, speeding to pass me and then slowing down. I drove steadily, carefully, and under the speed limit, as always. A deputy stationed on the median strip threw his hands up as I passed by, well below the speed limit. Terry was shocked that I arrived on time. Terry was unprofessional in his summary refusal of my case. When I returned home driving A1A there was no evidence of any accident or construction that would have caused the traffic jam. My access to legal counsel was further restricted.

162. Taken in its entirety, the body of facts stated above show a prolonged and systematic abridgement of First Amendment rights, especially free speech and freedom to petition for redress of grievances, as well as other federal rights (Fourth, Fifth, Seventh, Eighth, Fourteenth Amendments and right to privacy). There is another thread showing that I have been unlawfully denied access to food, telephone, housing, gasoline, employment, legal counsel and other important services. The abuses are ongoing and increasing in severity. What started as a single incident of sexual harassment and 20 hours of false imprisonment has snowballed into murder, death threats, beatings, forcible drugging, 18 months false imprisonment, the total destruction of my business, the theft of almost everything I own, and the demolition of my home. I do not know how to stop the abuse. I am a competent, law-abiding person who has never committed a crime. Will I be subjected to this for the rest of my life? The FBI has a duty to protect me.

Thank you for your anticipated cooperation.

Sincerely,

Deborah Cooney

# VI. STATEMENT OF LAW

163. This claim arises from the improper litigation of the Underlying Cases.

164. The improprieties give rise to a Federal due process claim under 42 U.S.C. 1983, 1985, and 1986, as the Plaintiff was denied a jury trial in violation of her Seventh and Fourteenth Amendment Constitutional rights.

165. Whereas most of the Defendants are "state actors", as public entities, public employees, public contractors, or officers of the court, they are liable for their participation in the improprieties under 42 U.S.C. ss. 1983, 1985, or 1986. The remaining Defendants worked with the state actors to deny Plaintiff's federal rights and defraud the courts.

166. This claim, filed on March 22, 2018, falls well within the one-year statute of limitations as the abuses are ongoing. The Florida malicious prosecution was terminated on April 25, 2017, and was the Defendants' primary vehicle with which to perpetrate fraud on the courts. Under federal law, "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." (Knox v. Davis (9th Cir. 2001) 260 F.3d 1009, 1013.) "The applicable statute of limitations for civil rights actions brought in California under 42 United States Code section 1983 (section 1983) is the one-year statute of limitations for personal injury actions, as provided in Code of Civil Procedure section 340, subdivision (3)." (West Shield Investigations & Security Consultants v. Superior Court (2000) 82 Cal.App.4th 935, 953.) Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues.

A.   HISTORY OF THE UNDERLYING CASES

167. Plaintiff has continuously made overtures to settle the Underlying Cases for nothing more than improvements in public safety and pledges to honor the Constitution and other laws of the land.

168. The Defendants, public entities, officers, contractors, and employees, have continuously refused to abide by law. This fact, while shocking in its own right, has resulted in exponentially increased losses to the Plaintiff as well as the community at large.

169. The Plaintiff has filed and will continue to file, as necessary, additional litigation and reports to appropriate authorities regarding the ongoing abuses. All members of the judiciary, are required to do the same per the Code of Conduct for United States Judges cited below:

Canon 3 (B) (5): A judge should take appropriate action upon learning of reliable evidence indicating the likelihood that a judge's conduct contravened this Code or a lawyer violated applicable rules of professional conduct.

170. The record shows that all of the Attorney Defendants violated the American Bar Association Rules of Professional Conduct governing attorney-client privilege, failure to act competently, termination of employment, fees for legal services, conflicts of interest, false statements of fact or law, presenting an action or defense without probable cause and not warranted by law, and/or suppression of evidence. These Attorney Defendants likewise violated the corresponding state bar rules.

B. ONGOING ABRIDGEMENT OF PLAINTIFF'S FIRST AMENDMENT RIGHTS

171. The Defendants' conduct in the Underlying Cases comprises an elaborate scheme to deprive Plaintiff of her First Amendment rights. Plaintiff exercised her right to petition the

government for redress of grievances and her right to freedom of speech. In order to strongly discourage Plaintiff from exercising these rights, the Defendants falsely arrested, maliciously prosecuted, and forcibly committed her to a mental institution, knowing full well that she had never committed a crime, nor was she mentally ill, nor had she ever been mentally ill. Defendants demonstrated their ability to get away with this suppression of First Amendment rights, and as a result, chilling these rights ad infinitum.

172. The derailing of the Underlying Cases proves that Plaintiff's First Amendment rights have been effectively and permanently eradicated by the Defendants' conduct. Because Plaintiff is suffering an ongoing deprivation of rights, she has standing to sue. Plaintiff respectfully asks this Court to reinstate her Constitutional rights.

173. Case law supports federal intervention under these circumstances.

174. "At the same time, however, the Court clearly left room for federal injunctive intervention in a pending state court prosecution in certain exceptional circumstances—where irreparable injury is 'both great and immediate,' 401 U. S., at 46, where the state law is " `flagrantly and patently violative of express constitutional prohibitions,' " 401 U. S., at 53, or where there is a showing of "bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief." 401 U. S., at 54." Mitchum v. Foster, 407 US 225, 230 - Supreme Court 1972

175. "But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest

that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury." Dombrowski v. Pfister, 380 US 479, 486 - Supreme Court 1965

## C. THE LANTERMAN-PETRIS-SHORT (LPS) ACT IS UNCONSTITUTIONAL

176.  Although there have been a few constitutional challenges to the LPS Act, many issues have not yet been addressed by the courts.  Free exercise of religion, state-sponsored religion, right to counsel, protection from self-incrimination, right to privacy, cruel and unusual punishment and excessiveness are some of the issues which have not yet been settled by the courts.  Although the due process rights have been interpreted as constitutional with regard to a gravely disabled person, they have never been reviewed as they relate to a mentally competent, non-dangerous, law-abiding citizen. The Plaintiff has standing to ask that the Court address these issues here.

177.  The facts of the instant case demonstrate that, in practice, the LPS Act is being used to chill freedom of speech.  The overbroad sweep of the statute, as well as its deputizing of mental health professionals, creates a rife opportunity for abuse.  The abuse it fosters or invites abridges fundamental rights.

178.  "When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal

prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases." See Baggett v. Bullitt, supra, at 379. Dombrowski v. Pfister, 380 US 479 - Supreme Court 1965

179. 16 Am Jur 2d, Sec 177 late 2d, Sec 256:

"The general misconception is that any statute passed by legislators bearing the appearance of law constitutes the law of the land. The U.S. Constitution is the supreme law of the land, and any statute, to be valid, must be In agreement. It is impossible for both the Constitution and a law violating it to be valid; one must prevail. This is succinctly stated as follows:

The General rule is that an unconstitutional statute, though having the form and name of law is in reality no law, but is wholly void and ineffective for any purpose; since unconstitutionality dates from the time of its enactment and not merely from the date of the decision so branding it. An unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed. Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted.      Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it.....

A void act cannot be legally consistent with a valid one. An unconstitutional law cannot operate to supersede any existing valid law. Indeed, insofar as a statute runs counter to the fundamental law of the land, it is superseded thereby.

No one is bound to obey an unconstitutional law and no courts are bound to enforce it."

180. The U.S. Constitution is the highest statutory authority in the country. All other statutes follow from and are subordinate to the Constitution. Any statute which violates the Constitution must therefore be repealed or modified.

181. The LPS Act is unconstitutional because it imposes a state-sponsored religion, namely a belief in of Western medicine, on the citizens thereby depriving them of their First Amendment right to religious freedom. Many religions eschew Western medicine because it requires the use of harmful, toxic drugs and body-altering surgeries. Moreover, Western doctors, hospitals, and manufacturers of drugs and medical equipment have a strong profit motive to create and diagnose illness in perfectly healthy individuals. These morally reprehensible qualities violate the core beliefs of many religions, including Plaintiff's.

182. There are many natural therapies available to persons who are truly ill, which comply with religious doctrines of Christian Science and Do No Harm" and effectively cure disease and heal injury. The state has no right to impose controversial medical treatment, which many religions prohibit, when natural therapies, accepted by all religions, are widely available and affordable. The state has no right to prevent persons from utilizing safe natural therapies such as nutritional healing, earthing, acupuncture, chiropractic, reflexology, yoga and exercise, etc. to treat disease. Incarceration of the patient effectively prevents access to these safer treatment options.

183. The U.S. Supreme Court unanimously agreed with the ACLU that the use of a hallucinogenic plant as part of a spiritual practice is protected under the First Amendment religious liberty clause. (*Gonzales v. O Centro Espirito Unaio Do Vegetal* (2006) 546 U.S.

418.) Under the same legal theory, the conscientious use of any form of natural healing is similarly protected, and the state-enforced use of chemical, electrical, or surgical treatments, prohibited by certain religious doctrines, would also be unconstitutional. This legal theory is confirmed by several U.S. Supreme Court decisions. Compelling Jehovah's Witness children to salute the American flag against their religious beliefs was held unconstitutional. (*West Virginia v. Barnett* (1943) 319 U.S. 624.) Alabama's "moment of silence" law which required public school children to take a moment for "meditation or voluntary prayer," violated the Establishment Clause. (*Wallace v. Jafree* (1985) 472 U.S. 38.) Conscientious objector status was extended to those who do not believe in a supreme being, but who oppose war based on sincere beliefs that are equivalent to religious objections. (*U.S. v. Seeger* (1965) 380 U.S. 163.)

184. The LPS Act is unconstitutional because it infringes on the Fourth Amendment right to be secure against unreasonable search and seizure. In common practice, the LPS Act closely resembles a "witch hunt" whereby an individual is singled out, accused of being intoxicated or mentally disordered, and institutionalized without any underlying evidence of unlawful behavior. In *Safford Unified School District v. Redding* (2009) 557 U.S.__ (Docket No. 08-479), the Supreme Court ruled that a 13-year old girl could not be strip-searched based on a classmate's uncorroborated accusation. The Court further defined "probable cause", a far stricter standard than the mere "reasonable suspicion" or the even laxer "reliable knowledge", to require that law enforcement must have knowledge that raises a "substantial chance" of discovering evidence of criminal activity. The LPS Act does not meet this standard since it incarcerates and invasively searches without requiring any suspicion of criminal conduct. The on-demand urine drug test authorized by the LPS Act contravenes the central holding of

*Chandler v. Miller* (1997) 520 U.S. 305, which struck down a Georgia law requiring candidates for political office to take a drug urine test.

185. The LPS Act abridges the Fifth Amendment right against self-incrimination and the Sixth Amendment right to counsel, under the guise of a psychological examination. The renown *Miranda v. Arizona* (1966) 384 U.S. 436, established Miranda warnings to advise arrestees of these rights. *Escobedo v. Illinois* (1964) 378 U.S. 478, prohibited unconstitutional interrogations, such as an "evaluation" under the LPS Act.

186. The LPS Act is unconstitutional because it violates the Fifth and Fourteenth Amendment requirements of "due process of law." The practice of seizing persons without a warrant, when it is clear that no laws have been broken, imprisoning them without bail, Miranda rights, or a speedy trial is in direct contravention of both the U.S. and the California Constitution. Due process has been interpreted to mean that "...before a man's life or liberty or property may be taken by the state, he must be given notice of the proceedings which may terminate in the taking, and be given an opportunity to be heard in his own defense." *(Beck v. Ransome-Crummey* (1919) 42 Cal. App. 674, 184 P. 431, 433.) The Supreme Court's unanimous opinion in *Addington v. Texas* (1979) 441 U.S. 418, raised the standard of proof for involuntary commitment to "clear and convincing evidence." (CT 2:403-4) The much lower standard of "probable cause" allowed by the LPS Act is therefore unconstitutional.

187. The judicial interpretation of liberty guaranteed by the due process clause was further expanded in *Griswold v. Connecticut* (1965) 381 U.S. 479 to "a rational continuum which,

broadly speaking includes a freedom from all substantial arbitrary impositions and purposeless restraints." The Supreme Court used this rationale to strike down a state law which meddled into private matters of health care. The Fourteenth Amendment reads: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens...nor deny any person the equal protection of the laws." The LPS Act severely curtails the privileges and immunities of mentally disordered persons and denies them equality.

188. The LPS Act is unconstitutional because it imposes "cruel and unusual punishment" in direct contravention of the Eighth Amendment. In a civilized society, it is considered highly improper to throw a sensitive woman, who has broken no laws, into an open area of a mental institution to co-mingle with criminally insane and otherwise dangerous persons, primarily of the male gender. Common decency dictates that sick persons who can care for themselves competently at home or on their own should not be forcibly subjected to inferior and inhumane care by the state, especially when such persons have never committed a crime. Responsible medicine does not authorize the medical treatment of a condition, when the condition does not exist or has not been diagnosed or verified, yet such treatment is being forcibly rendered under the LPS Act. Furthermore, it is counter-productive to punish persons at all when they have not violated any penal code.

189. This argument is further supported by Constitutional case law. A punishment is "excessive," and therefore prohibited by the Amendment, if it is not graduated and proportioned to the offense. (*Weems* v. *United States* (1910) **217 U.S. 349,367.**) The LPS Act imposes punishment, masquerading as "treatment", even in instances where there is no offense. By the

*Weems* standards, no punishment should result when no offense has been committed. Even the *Weems* dissenting opinion concurs with Appellant's analysis, "the clause against cruel punishments, which was intended to prohibit inhumane and barbarous bodily punishments" such as the treatment imposed by the LPS Act, including forcible drugging, injection, electric shock or surgery.

190. An excessiveness claim is judged by currently prevailing standards of decency. *(Trop* v. *Dulles* (1958) 356 U.S. 86.) The *Trop* opinion goes on to state that the Eighth Amendment bars "the total destruction of the individual's status in organized society." Involuntary hospitalization certainly fits this bill, preventing people from pursuing their profession, contributing to society, and fulfilling familial duties at home. In *Rochin v. California* (1949) 342 U.S. 165, the Supreme Court abolished acts which "shock the conscience" or violate the "decencies of civilized conduct."

191. The LPS Act is unconstitutional because it infringes on the "right to privacy", a long-acknowledged fundamental human right, covered under the penumbra of the Fourth, Fourteenth, and Ninth Amendments, and further defined by case law such as *Roe v. Wade* (1973) 410 U.S. 113, P. 147-164, which protects the right of a woman and her doctor to make health care decisions regarding abortion, prohibiting state intervention. Similarly, *Gonzales v. Oregon* (2006) 546 U.S. 243 held that terminally ill persons have a right to make end-of-life decisions in consultation with their doctors, rejecting the federal government's misguided effort to interfere. The power to make intimate personal decisions pertaining to health care rests exclusively with

the individual and his or her chosen health practitioner, and is not the province of an overbearing state.

## D. THE FORENSIC CLIENT SERVICES (FCS) ACT IS UNCONSTITUTIONAL

192. Florida statute chapter 916 et seq., known as the Forensic Client Services Act, is unconstitutional for the same reasons stated above regarding the LPS Act. The FCS Act further deprives persons of their rights to counsel and speedy trial afforded by the Sixth Amendment.

## E. DEFENDANTS VIOLATED THE LPS ACT AND/OR THE FCS ACT

193. Even if the LPS and FCS Acts were compatible with the Constitution, Defendants are still liable for violating them. Neither the LPS Act nor the FCS Act authorizes the involuntary commitment or treatment of a non-dangerous, mentally competent law-abiding person, nor do they authorize any court to sanction such an involuntary commitment.

## F. DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS

194. The Defendants have abridged the Plaintiffs civil rights under the United States Constitution as follows:

First Amendment right to free exercise of religion

195. Plaintiff's practices the Christian Science faith. Plaintiff's religion espouses the doctrine of "do no harm" and eschews Western medicine, as it has been proven very harmful to humans. Plaintiff believes in living in harmony with nature and keeping the body well-nourished, well-rested, and free of toxins. Defendants have infringed upon her right to practice this religious belief. Defendants have also instituted a state-sponsored religion, the cult of Western medicine, in violation of the First Amendment.

First Amendment right to freedom of speech and right to petition the government for redress of grievances

196.   Defendants have refused to honor Plaintiff's right to request public health and safety provisions by bringing a legal action in a court of law as well as other means.  In fact, they have gone to extreme measures to silence the Plaintiff.  Defendants have taken harsh and unlawful measures to retaliate against Plaintiff's honest reporting of their misconduct.

Fourth Amendment right of the people to be secure in their persons

197.   Arrest without probable cause is strictly prohibited by the Fourth Amendment.  Defendants have not only violated Plaintiff's person, but have repeatedly improperly justified their transgressions.

Fifth Amendment right to life, liberty, and property

198.   Defendants have proximately and systematically caused Plaintiff to lose her liberty, by enforcing, upholding, or misapplying California, Florida, and West Virginia laws in violation the Constitution.  Defendants have proximately caused Plaintiff to lose her property and reduce her business earnings and her savings.

Fifth Amendment right to due process of law

199.   Defendants have denied Plaintiff the due process of litigating her claims in accordance with publicly-maintained statutory procedures.

Sixth Amendment right to speedy trial and counsel

200. Defendants repeatedly denied the Plaintiff access to competent counsel.  Defendants further interfered with Plaintiff's ability to represent herself in court.  Defendants held Plaintiff in custody denying her a trial for more than 18 months.

<u>Seventh Amendment right to a civil jury trial</u>

201. Defendants have gone to drastic extremes to deny Plaintiff a jury trial in the Underlying Cases.

<u>Eight Amendment right to be free from excessive restraint or punishment</u>

202. Defendants have advanced a malicious prosecution which caused Plaintiff to endure excessive restraint as well as torture. Plaintiff has never committed a crime, nor is there any evidence of this. The malicious prosecution did not serve any legitimate state interest.

<u>Ninth and Tenth Amendment rights retained by the people and right to privacy</u>

203. Defendants have conducted and upheld the intrusion of Plaintiff's person and property, in ways that usurp power and disparage rights possessed by the Plaintiff.

<u>Fourteenth Amendment</u>: States shall not deprive citizens of privileges, life, liberty or property, due process of law, and equal protection of the laws

204. All of the above applies specifically to all of the Defendants who are authorized to act under color of the law or who aided and abetted the state actors. By ignoring or violating statute, Defendants have denied Plaintiff equal protection of the laws.

205. The infringement of civil rights described above are expressly prohibited by the Criminal Code, 18 U.S.C. ss. 241-2, Chapter 13, Civil Rights, Conspiracy against rights, Deprivation of rights under color of law. Civil remedies are set forth in the Public Health and Welfare Code, 42 U.S.C. ss. 1983, 1985, and 1986, Chapter 21, Civil Rights, Civil action for deprivation of rights, Conspiracy to interfere with civil rights, Action for neglect to prevent.

G. PLAINTIFF HAS TAKEN RESPONSIBILITY TO MITIGATE DAMAGES

206. Plaintiff has lived an exemplary and healthy lifestyle. Plaintiff takes care of her health, eating fresh, nourishing, organic foods, drinking clean water and nothing else (no coffee or soft drinks), getting plenty of exercise and fresh air, going to the beach or natural landscape daily to practice yoga, swim, walk, hike, jog or bicycle. Consequently, Plaintiff has enjoyed excellent health.

207. Plaintiff has never suffered from a mental disorder.

208. Plaintiff is a law-abiding citizen.

209. Plaintiff has never engaged in any dangerous behavior.

210. Plaintiff is a teetotaler. Plaintiff has never used drugs, whether prescription or street drugs.

211. Plaintiff practices her religious belief in natural healing, using only gentle, safe, effective, traditional methods of healing from illness or injury. Plaintiff does not use forceful, harmful allopathic medicine.

## H. DEFENDANTS ACTED WITH MALICE, FRAUD, AND OPPRESSION

212. Defendants recklessly and maliciously violated the Plaintiff's rights, knowing or with reasonable diligence they should have known, that they were infringing upon the Plaintiff's liberties and causing her to incur damages.

213. Defendants defrauded the Plaintiff and the general public by falsely asserting as fact statements that they knew, or with reasonable diligence, should have known, were untrue.

214. Defendants' reckless and criminal behavior was oppressive and harmful to the Plaintiff.

## I. GROUNDS FOR INJUCTIVE RELIEF

215. There is a substantial likelihood of success on the merits of this case.

216. The Plaintiff faces substantial damages if injunction is not granted. Plaintiff's damages consist of an ongoing loss of her Constitutional rights. Moreover, there are hundreds, if not thousands, of other citizens facing similar damages and injuries.

217. The balance of harm to the Plaintiff and the general public weighs in favor of the Plaintiff. The hardship to the Plaintiff and the general public greatly outweighs any costs that Defendants would incur through the issuance of the injunction as requested. In fact, the Defendants should not incur any cost at all from the proposed order and will actually save money, in the long run, by immediately ceasing an unsafe, unlawful and costly practice, thus mitigating damages and injuries to the population at large and reducing the number and dollar amount of claims for civil rights violations or injuries.

218. The granting of the requested injunction would serve the public interest by setting a precedent to protect all citizens from similar abuses.

## VII. PLAINTIFF RETAINS ALL RIGHTS

219. Plaintiff reserves the right to amend the Complaint to correct legal errors or omissions due to her inexperience in legal matters, or to supplement with additional information which is revealed through discovery, or for any other reason.

220. The true names and capacities of Defendants sued herein as Does 1-100, inclusive, are unknown to the Plaintiff, and the Plaintiff therefore sues these Defendants under fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named Defendants were involved in and were parties to the furtherance of the acts complained of herein.

221. Plaintiff incorporates all paragraphs and causes of action into all other paragraphs and causes of action herein.

222. Plaintiff incorporates all documents submitted in all of the Underlying Cases into the causes of action stated herein.

223. Plaintiff wishes to exercise the right to a civil jury trial conferred upon her by the Seventh Amendment to the U.S. Constitution.

224. Plaintiff appears in this action In Propria Persona or Pro Se, and asks that the issues raised herein be addressed "on the merits", *Sanders v. United States*, 373 US 1, at 16,17 (1963); and addressed with "clarity and particularity", *McClesky v. Zant*, 111 S. Ct. 1454 at 470-71 (1991); and that the Plaintiff be afforded a full and fair evidentiary hearing, *Townsend v. Sain*, 372 US 293 at p.1 (1962) See also *Picking v. Pennsylvania Railroad Co.*, 151 F.2d 240 (3rd Cir. 1945).

225. Plaintiff asks this Court to recognize the fact that this "Pro Se litigant's pleadings are to be construed liberally and held to less stringent standards than lawyers." *Haines v. Kerner, Warden of Illinois State Penitentiary at Menard*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d, 652 (1972). See also *Platsky v. CIA*, 953 F. 2d 26 (1971), "Court errs if Court dismisses pro se litigant without instructions of how pleadings are deficient and how to 'repair' pleadings."

226. "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end...Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." *Maty v. Grasselli Chemical Co.*, 303 US 197 (1938).

227. "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.[5] Dent v. West Virginia, 129 U. S. 114. Cf. Slochower v. Board of Education, 350 U. S. 551; Wieman v. Updegraff, 344 U. S. 183. And see Ex parte Secombe, 19 How. 9, 13." *Schware v. Board of Bar Examiners of NM*, 353 US 232, P. 238-9 (1957).

228. "[T]here [can] be no sanction or penalty imposed upon one because of his exercise of constitutional rights. In Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967)" *Sherar v. Cullen*, 481 F. 2d 945, P. 947 (1973).

## VIII. STATEMENT OF PURPOSE

229. By this action, the Plaintiff endeavors to safeguard and protect the public health and justice from the abuses of the "government-industrial complex", a variation on a term originally coined by President Dwight D. Eisenhower as the "military-industrial complex." In a famous speech on January 17, 1961, President Eisenhower astutely recognized the devastating potential influence of unbridled avarice on our political system. He warned that this would be the greatest threat to our democracy. The same principles apply here vis-a-vis the health care industry, and specifically concerning mental health. The Plaintiff prays that this Court will prudently exercise its authority to reverse this trend before every law-abiding citizen is locked away in the name of corporate profit.

230. The Plaintiff has filed this action with the sincere hope of empowering the weak to stand up and push back against the tyranny of the strong, thus achieving balance and justice. The Plaintiff strives to be a role model, an inspiration, and even a mentor to others who wish to assert their legal rights in the face of unconscionable abuses. Most of the victims cannot afford to hire counsel, and are left with only two unsavory options: knuckle under, thereby enabling the abuse, emboldening the abusers, and encouraging future abuses of even greater magnitude; or make a significant investment of time, energy, and emotional fortitude into the pursuit justice through the legal system, taking the time to study the law, research the issues, painstakingly prepare the documents, and thoughtfully compose the legal arguments. This is the dawning of the "pro per revolution" in which the people take back their power through proper legal channels. Echoing the wisdom of the heroic citizen activist, Ralph Nader, the institutional criminals may habitually tune out the voice of the people, but they understand and take heed when they are served with a civil lawsuit.

## IX. REQUEST FOR RELIEF

231. WHEREFORE, Plaintiff respectfully requests the compensatory, declaratory and injunctive relief herein sought, as well as costs, and such other and further relief as the Court shall deem proper.

A. COMPENSATORY DAMAGES

**First Claim for Relief**

232. Plaintiff has suffered losses of life's priceless treasures, which cannot easily be reduced to dollar amounts. Plaintiff's actual damages are astronomical. A conservative estimate of legally cognizable damages is displayed below:

General Damages:

| | |
|---|---|
| Pain, suffering, and inconvenience.....................................$ | 1,000,000 |
| Emotional distress.......................................................$ | 1,000,000 |

Estimated future losses from emotional distress......................... $ 2,000,000

Loss of consortium............................................................$5,000,000

Special Damages:

Loss of earnings (to date)................................................$   1,000,000

Estimated future loss of earnings from emotional distress.................$2,000,000

Punitive Damages...........................................................................$  8,000,000

                        _____

Total Damages.............................................................................$ 20,000,000

233. If the Court grants the declaratory and injunctive relief as requested below, the Plaintiff's future losses will be significantly diminished, and the Plaintiff will be willing to accept only $16,000,000 in total compensatory damages, based on the restoration of her Constitutional rights.

B. DECLARATORY AND INJUNCTIVE RELIEF

**Second Claim for Relief**

234. Plaintiff respectfully asks the Court to declare that all of the Defendants have committed or aided and abetted the commissions of both intrinsic and extrinsic fraud the federal courts in the four Underlying Cases and/or the state courts of California, Florida, and/or West Virginia.

**Third Claim for Relief**

235. Plaintiff respectfully asks the Court to declare that the judgments are void in the four Underlying Cases and the 2009 California sexual harassment case due to fraud on the court.

**Fourth Claim for Relief**

236. Plaintiff respectfully asks the Court to declare that all of the Attorney Defendants have violated the due process and equal protection clauses by breaching professional ethics.

**Fifth Claim for Relief**

237. Plaintiff respectfully asks the Court to issue an injunction preventing Defendant Indian River County from continuing to use the Sheriff's office to traffic in narcotics.

**Sixth Claim for Relief**

238. Plaintiff respectfully asks the Court to issue an injunction preventing Defendant Indian River County from continuing to use the Sheriff's office to burglarize or vandalize privately owned real or personal property.

**Seventh Claim for Relief**

239. Plaintiff respectfully asks the Court to issue an injunction preventing the Defendant City of San Diego from using its police force to burglarize or vandalize privately owned real or personal property.

**Eighth Claim for Relief**

240. Plaintiff respectfully asks the Court to issue an injunction preventing all Defendants with police or prosecutorial powers and all Defendant public attorneys from continuing their practice of illegal stop and frisks, false arrest and imprisonment, malicious prosecution, and false allegations of mental illness, and false reporting of any kind.

**Ninth Claim for Relief**

241. Plaintiff respectfully asks the Court to issue an injunction against the use of all energy weapons, tasers, stingrays, GPS monitors, x-ray scanners, wireless courtroom security installations, and other radiation-emitting devices.

**Tenth Claim for Relief**

242. Plaintiff respectfully asks the Court to declare that the Defendant City of San Diego's coerced agreement preventing Plaintiff from visiting La Jolla Cove is void.

**Eleventh Claim for Relief**

243. Plaintiff respectfully asks the Court to declare that the Defendants violated Plaintiff's civil rights under the U. S. Constitution, the highest statutory authority, and thus, the Defendants are liable for damages pursuant to 42 U.S.C. ss. 1983, 1985 and/or 1986.

**Twelfth Claim for Relief**

244. Plaintiff respectfully asks the Court to declare that Defendants Colton, Workman, Dodd, Brawner, Vero Beach, and Indian River County falsely arrested, imprisoned, and maliciously prosecuted the Plaintiff in a manner contrary to law.

**Thirteenth Claim for Relief**

245. Plaintiff respectfully asks the Court to issue an injunction requiring Defendants Roddy, Smith, Vero Beach, and Indian River County to seal or expunge the judicial and non-judicial arrest records and court records which were brought about contrary to law.

**Fourteenth Claim for Relief**

246. Plaintiff respectfully asks the Court to declare that the plaintiff has a right to be in any public place that is open to the public.

**Fifteenth Claim for Relief**

247. Plaintiff respectfully asks the Court to issue an injunction requiring Defendants San Diego City and County, Vero Beach, and Indian River County to remove and rescind any trespass warnings and refrain from arresting for trespass any person who is in a public place which is open to the public.

### Sixteenth Claim for Relief

248. Plaintiff respectfully asks the Court to declare that any establishment that is open to the public cannot force a person to leave as retaliation for exercising free speech. The use of any trespass statute for this purpose is unconstitutional as applied.

### Seventeenth Claim for Relief

249. Plaintiff respectfully asks the Court to declare that the denial of the Plaintiff's habeas corpus petitions by the state and federal courts was unconstitutional.

### Eighteenth Claim for Relief

250. Plaintiff respectfully asks the Court to declare that the LPS Act, also known as California Welfare & Institutions Code section 5000 et sequence, and the FCS Act, also known as Florida Statute Chapter 916 et sequence, are unconstitutional.

### Nineteenth Claim for Relief

251. Plaintiff respectfully asks the Court to declare that the conduct of Defendants SFETC and DCF fell below the standard of care.

### Twentieth Claim for Relief

252. Because of the declared infringement of state and federal law, and in order to promote and protect the public health and safety, and in the interest of significantly reducing monetary damages, Plaintiff prays for a preliminary injunction to immediately suspend the practice of forcibly incarcerating or institutionalizing healthy, law-abiding citizens.

### Twenty-First Claim for Relief

253. Plaintiff respectfully asks the Court to declare that Defendant Peevey has breached ethics

and violated the California Public Utilities Code section 303(a) by holding an official relationship to and a financial interest in the companies and/or persons that he is entrusted with regulating. Plaintiff further requests that the Court declare all of the CPUC legal proceedings under the leadership of Defendant Peevey, regarding the Smart Grid, void due to fraud on the CPUC.

## Twenty-Second Claim for Relief

254. Plaintiff respectfully asks the Court to declare that the Defendants SDG&E, FPL, and Monpower violated 42 U.S.C. section 3515b and 45 CFR Part 46 by using Federal funds to subject the unsuspecting population to a horrific human experiment on the non-thermal effects of non-ionizing radiation, without obtaining the informed consent of the participants, and/or by subjecting the participants to greater than minimal risk, and/or by imposing risks that are not reasonable in relation to anticipated benefits.

## Twenty-Third Claim for Relief

255. Plaintiff respectfully asks the Court to declare that the Defendants SDG&E, FPL, and Monpower violated 18 U.S.C. ss. 371, 653, 666, 1001, and 1018 by making false and fraudulent statements in their Smart Grid Deployment Plan, by which they received Federal matching funds under 42 U.S.C. section 17386. Plaintiff further prays that the Court remand these Defendants and their officers to the U.S. Attorney General for criminal prosecution under the Title 18 Criminal Code.

## Twenty-Fourth Claim for Relief

256. Plaintiff respectfully asks the Court to issue a preliminary injunction pursuant to 15 U.S.C. section 1267(a) prohibiting all Defendants from transporting or receiving, or allowing the transport or receipt of hazardous substances, including Smart Meters and Smart Grid equipment,

across state lines. Plaintiff further requests that the Court declare that Defendants Itron, SDG&E, FPL, Monpower, Peevey, and Picket are liable for damages caused by their complicity in the release of hazardous substances, pursuant to 42 U.S.C. section 9607.

**Twenty-Fifth Claim for Relief**

257. Because of the declared infringement of state and federal law, and in order to promote and protect the public health and safety, and in the interest of significantly reducing monetary damages, Plaintiff prays for a preliminary injunction to immediately dismantle and roll back the Smart Grid program, remove all associated radio frequency and digital equipment, and replace with the original, safe, analog equipment which worked flawlessly for many years prior to the Smart Grid installation. If necessary, Plaintiff requests that the Court declare the Smart Grid unconstitutional.

258. Plaintiff prays that the preliminary injunction be extended until such time as a safe, reliable, and efficacious Smart Grid can be designed, manufactured, procured, properly tested for health and safety, and implemented; or until the people, through a referendum or through their elected representatives, decide to discard, disband, and dismantle the Smart Grid program upon finding it to be a useless and wasteful diversion from the quest for clean, sustainable energy. Plaintiff prays that the preliminary injunction be permanent.

## X. VERIFICATION

I, Deborah Cooney, verify and declare that the factual statements in the foregoing Complaint are true and correct to the best of my knowledge and belief, under penalty of perjury under the laws of the United States.

Respectfully submitted,

Date: March 22, 2018

Deborah Cooney, Plaintiff in Propria Persona

VERIFIED COMPLAINT